**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEONEL VALDÉS, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:20-cv-06042-LDH-AYS |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| KANDI TECHNOLOGIES GROUP, INC., HU XIAOMING, JEHN MING LIM, MEI BING, and ZHU XIAOYING, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

NATURE OF THE ACTION .................................................................................................. 1

JURISDICTION AND VENUE ............................................................................................. 3

PARTIES ................................................................................................................................ 3

SUBSTANTIVE ALLEGATIONS ........................................................................................ 5

   A.   Kandi's Background and History of Fraudulent Conduct ................................... 5

   B.   Kandi Used Transactions with Related Parties to Conceal Lost EV Sales Following
       Changes to China's EV Subsidy Program .......................................................... 9

   C.   Kandi Was Required to Disclose Related Party Transactions ........................... 11

       1.   Chaoneng Was an Undisclosed Related Party to Kandi ........................ 14

       2.   Kuke was an Undisclosed Related Party to Kandi................................. 17

       3.   Massimo is an Undisclosed Related Party to Kandi ............................. 21

       4.   Jass Motorsports Has Significant Ties to Kandi ................................... 23

   D.   Kandi's Related-Party Transactions Were Material ........................................... 25

   E.   Materially False and Misleading Statements ..................................................... 26

       1.   The March 25, 2019 False and Misleading Statements .......................... 26

       2.   The May 10, 2019 False and Misleading Statements ............................. 28

       3.   The August 9, 2019 False and Misleading Statements........................... 30

       4.   The November 12, 2019 False and Misleading Statements.................... 31

       5.   The April 28, 2020 False and Misleading Statements ............................ 34

       6.   The June 5, 2020 False and Misleading Statements ............................... 37

       7.   The August 10, 2020 False and Misleading Statements ......................... 41

       8.   The November 9, 2020 False and Misleading Statements....................... 45

THE TRUTH IS REVEALED................................................................................................ 47

POST-CLASS PERIOD EVENTS ........................................................................................ 49

ADDITIONAL SCIENTER/FALSITY ALLEGATIONS ................................................... 50

LOSS CAUSATION/ECONOMIC LOSS ........................................................................... 51

CLASS ACTION ALLEGATIONS ...................................................................................... 53

   COUNT I ........................................................................................................................ 55

   COUNT II ....................................................................................................................... 59

PRAYER FOR RELIEF ........................................................................................................ 60

DEMAND FOR TRIAL BY JURY ....................................................................................... 60

Lead Plaintiffs Kasser Akil, Manfred Schumacher and Mohammad Fakir (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, review and analysis of United States Securities and Exchange Commission ("SEC") filings by Kandi Technologies Group, Inc. ("Kandi" or the "Company"), regulatory filings of the Company's subsidiaries, wire and press releases, earnings call transcripts, analyst reports, media reports, and other publicly available materials. Plaintiffs also consulted with investigators and forensic accounting consultants. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants, who purchased or otherwise acquired Kandi stock between March 15, 2019 and November 27, 2020, both dates inclusive (the "Class Period"). Plaintiffs seek to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    Kandi was incorporated in 2004 and is headquartered in Jinhua, the People's Republic of China (the "PRC" or "China"). The Company, through its subsidiaries, designs, develops, manufactures, and commercializes electric vehicle ("EV") products and parts and off-road vehicles in China and internationally.

3.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) two of its major customers and one of its major suppliers were related parties to Kandi; (ii) as a result of the undisclosed related-party nature of Kandi's top customers, Kandi artificially inflated its reported revenue from "unrelated" parties and underreported revenue from "related" parties; (iii) it was foreseeable that the foregoing, once revealed, was likely to cast doubt on the validity of Kandi's reported revenue and, in turn, have a foreseeable negative impact on the Company's reputation and valuation; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.    On November 30, 2020, Hindenburg Research published a report entitled: *Kandi: How This China-Based NASDAQ-Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors* (the "Hindenburg Report"). Citing extensive on-the-ground inspection at Kandi's factories and customer locations in China, interviews with former employees and business partners, and review of numerous documents and public records, the Hindenburg Report asserted that almost 64% of Kandi's sales over the past 12 months were to undisclosed related parties.

5.    Following publication of the Hindenburg Report, Kandi's stock price fell $3.86 per share, or 28.34%, to close at $9.76 per share on November 30, 2020.

6.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as the alleged misstatements entered, and the subsequent damages took place in, this District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.    Plaintiff Kasser Akil, as set forth in the Certification previously filed and incorporated by reference herein, purchased Kandi common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.    Plaintiff Manfred Schumacher, as set forth in the Certification previously filed and incorporated by reference herein, purchased Kandi common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Plaintiff Mohammad Fakir, as set forth in the Certification previously filed and incorporated by reference herein, purchased Kandi common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Kandi Technologies Group, Inc. is a Delaware corporation that was founded in March 2004. Kandi went public in June 2007 through a reverse merger with Stone Mountain Resources Inc., a Nevada company that had been pursuing a gold-mining venture. In December 2012, the Company changed its name to "Kandi Technologies Group, Inc."

15.     Kandi is headquartered in Jinhua City Industrial Zone, Jinhua, Zhejiang Province, People's Republic of China, Post Code 321016. The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "KNDI."

16.     Defendant Hu Xiaoming ("Hu") has served as the Kandi's Chief Executive Officer, President, and Chairman of the Board since June 2007.

17.     Defendant Jehn Ming Lim ("Lim") has served as Kandi's Chief Financial Officer ("CFO") since May 2020.

18.     Defendant Zhu Xiaoying ("Zhu") served as the CFO and director of Kandi from June 2007 until 2015 and as Interim CFO from September 2019 through May 2020.

19.     Defendant Mei Bing ("Mei") served as Kandi's CFO from November 2016 through January 2019 and as a director of the Company from December 2016 through January 2019.

20.     Defendants Hu, Lim, Zhu, and Mei are sometimes referred to as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of Kandi's SEC filings, press releases, and other market communications. The Individual

Defendants were provided with copies of Kandi's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Kandi, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse material facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.    Kandi and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.    Kandi's Background and History of Fraudulent Conduct

23.    Kandi designs, produces, manufactures, and distributes electric vehicles ("EVs"), EV parts, and off-road vehicles, primarily in China.

24.    Since its inception 2004, Kandi and Defendant Hu have been implicated in a number of questionable, if not outright fraudulent, conduct including: a scheme to artificially inflate the price of Kandi common stock; falsely exaggerating the number of EVs the Company produced; fraudulently collecting government subsidies for EVs that were manufactured and sold through related parties; failing to properly disclose related party transactions; and engaging the services of disreputable auditing firms that had been censored by the Public Company Accounting Oversight Board ("PCAOB") and/or banned from auditing Chinese companies.

25.    For example, in 2009, the Company was accused of inflating the sales figures of its electric car called the "Coco." Kandi represented in its quarterly report on Form 10-Q for the

second quarter of 2010 that the Company sold 1,005 Cocos during the quarter. A subsequent investigation, however, revealed that Kandi had vastly overstated the sales numbers. In fact, Kandi later admitted in its 2011 Form 10-K that its prior numbers were false, admitting that only 658 EVs were actually sold in *all* of 2010.

26.     Additionally, Defendant Hu was involved in what the SEC described as "secret oral agreements… to manipulate the trading of Kandi stock to increase its price." In May 2014, the SEC brought fraud charges against several stock promoters, accusing them of "orchestrat[ing] manipulative trading in… Kandi Technologies in 2009 and 2010" and of "conducting illegal reverse merger schemes" to bring two other Chinese companies "into the U.S. markets so they could manipulate trading and reap millions of dollars in illicit profits."[1] While Defendant Hu was not charged, the SEC found Kandi management provided the two promoters with 350,000 shares of Kandi stock in exchange for their manipulating trading in Kandi stock with the purpose of increasing its price to at least $3 per share within three months.[2]

27.     Kandi also has historically associated itself with disreputable auditors. For instance, on May 18, 2016, the PCAOB entered an Order censuring Kandi's independent registered public accounting firm, Albert Wong & Co. LLP ("AWC"). AWC was Kandi's accounting firm from 2009 through April 13, 2016. The PCAOB ultimately revoked AWC's registration and imposed penalties on the firm due to violations of PCAOB rules and standards in connection with audit reports that AWC issued on Kandi's consolidated financial statements for the years ended December 31, 2010, 2011, and 2012.[3] The PCAOB found that, among other things, AWC "failed

---

[1] SEC Press Release, *SEC Charges Toronto-Based Consultant and Four Others in Reverse Merger Schemes Involving China-Based Companies* (May 5, 2014), https://www.sec.gov/news/press-release/2014-91.

[2] *See* SEC Complaint, *SEC v. Kelley et al.*, Case No. 2:140-cv-02827-SRC-CLW (D.N.J. May 5, 2014).

[3] Order Instituting Disciplinary Proceedings, Making Findings, And Imposing Sanctions, In the Matter of AWC (CPA) Limited, WONG Chi Wai, CPA, and WONG Fei Cheung, CPA, PCAOB Release No. 105-

to address red flags regarding related party transactions and failed to place emphasis on testing material transactions with a related party." *Id.*

28. Notably, AWC failed to address red flags associated with related party transactions between Kandi and "Kandi USA," a company owned by Defendant Hu's son. Kandi USA was Kandi's largest customer in 2012 but Kandi purposely avoided disclosing the transactions by recording the sales to Kandi USA under the tradename "Eliteway Motorsport." While the Company disclosed that Kandi USA was a customer in 2013, it failed to disclose that it was a related party in the Company's 2013 Form 10-K.

29. In 2013, Kandi devised a strategy to benefit from an EV subsidy program sponsored by the Chinese government. Under the subsidy program, EV manufacturers received subsidies from the central government while EV purchasers received subsidies from local governments. To take advantage of the subsidies, Kandi established a joint venture (the "JV Company") with Geely Automobile Holdings Ltd. ("Geely"), in which Kandi and Geely each owned 50%.[4]

30. Pursuant to the joint venture agreement, Kandi manufactured EV parts that were purchased by the JV Company. The JV Company then manufactured EV vehicles and sold them to a third company – Zhejiang ZuoZhongYou Electric Vehicle Service Co., Ltd. – referred to as the "Service Company" or "Microcity" and partly owned by Kandi and Defendant Hu. The JV Company received EV manufacturing subsidies for manufacturing the cars, and the Service Company received EV purchasing subsidies from local governments for purchasing the vehicles.

---

2016-016 (May 18, 2016), available at https://pcaobus.org/Enforcement/Decisions/Documents/105-2016-016-AWC-CPA.pdf.

[4] Geely's ownership was through its wholly owned subsidiary, Shanghai Maple Guorun Automobile Co., Ltd.

31.     The EV subsidy program was rife with fraud and in early 2016, the Chinese government began a large-scale investigation. In December 2016, Kandi announced that the Chinese government conducted a review of subsidy payments for EVs manufactured by the JV Company from 2013 to 2014.[5] The review resulted in the JV Company being required to write off approximately $6.6 million of previously recorded accounts receivable.

32.     Subsequently, Chinese media outlets reported on Kandi's scheme, noting that Kandi was included on a list of companies that received fraudulent subsidies.[6] According to the Hindenburg Report, the Chinese government's investigation revealed that thousands of EVs the JV Company sold to the Service Company sat idle in a parking lot while Kandi collected subsidies.[7]

33.     The Company was also the subject of SEC inquiries stemming from the subsidy scheme. On December 28, 2016, the SEC sent Kandi a comment letter questioning Kandi's financial statements. In particular, the SEC sought information about Kandi's accounts receivable, the expected impact of reductions in government subsidies, and why "the amount due from the JV Company has been steadily increasing" so rapidly.

34.     Moreover, on March 13, 2017, Kandi suddenly announced that its financial statements for 2014 through 2016 needed to be restated and should no longer be relied upon. The restatements were necessary to address Kandi's improper accounting for notes receivable and payable, *its treatment and disclosures relating to related party transactions*, and its reporting of taxes.

---

[5] https://www.globenewswire.com/news-release/2016/12/20/899187/0/en/The-Final-Results-of-Government-Subsidy-Review-Related-to-Kandi-s-JV-Company-Released.html

[6] http://www.diyiev.com/news/show-2967.html

[7] https://www.shangyexinzhi.com/article/1616661.html

35.     Further, on October 2019, Kandi replaced its then-independent auditor, BDO, with its third auditor in five years – Marcum, Bernstein & Pinchuk ("Marcum") – a firm that was sanctioned by the PCAOB just a month earlier for violating auditor independence requirements by creating the perception that certain Chinese companies (some of which were Marcum clients) were high-quality investment opportunities.[8]

36.     On October 2, 2020, the PCAOB announced that it had imposed a $250,000 penalty on Marcum and prohibited the firm from auditing clients in China for three years for failing to perform appropriate procedures when auditing "significant unusual transactions" between Chinese entities.[9] Nevertheless, just six weeks after Marcum was prohibited from auditing Chinese clients, Kandi filed proxy documents seeking to reappoint Marcum as its auditor for the year.

**B.     Kandi Used Transactions with Related Parties to Conceal Lost EV Sales Following Changes to China's EV Subsidy Program**

37.     In 2016, the Chinese government changed the national subsidy program as a result of its investigation into the manipulation of that program. The adjustments dramatically impacted Kandi's ability to earn revenue through the subsidy program, as the JV Company (and its subsidiaries) had been Kandi's largest customer, accounting for the largest percentage of yearly sales between 2014 and 2017.

38.     No longer able to take advantage of the government subsidies, Kandi immediately reduced its stake in the JV Company from 50% to 22%. While Kandi represented to the market that the value of its remaining 22% interest in a restructured JV Company would far exceed the value of its original 50% equity position, Kandi eventually sold its remaining equity stake in the

---

[8]   https://pcaobus.org/news-events/news-releases/news-release-detail/pcaob-sanctions-two-firms-and-one-individual-for-auditor-independence-violations_712

[9]   https://www.accountingtoday.com/news/pcaob-sanctions-marcum-from-doing-china-audits

JV Company in March 2021 for approximately $47.3 million. For comparison, Kandi reported $201 million in revenue in 2015, of which $196 million was from the sale of EV parts, mostly to the JV Company.

39.    On a May 10, 2019 earnings conference call with investors, Defendant Hu commented on the negative effect the change in the subsidy policy had on the JV Company, confirming that the JV Company did not sell any EV products during the first quarter of 2019 and that the Company was required to "modify[] the JV Company's development plan […] causing a loss for the JV Company."

40.    The JV Company was Kandi's top customer from 2014 through 2017, representing between 60% and 90.4% of its sales.[10] Accordingly, the changes to the subsidy program and the JV Company's failure to sell any EV products during the first quarter of 2019 should have had a substantial negative impact on Kandi's 2018 and 2019 revenue.

41.    This, however, was not the case. Despite the loss of these sales, Kandi's reported EV sales remained relatively stable, and even increased year-over-year in both 2018 and 2019. In fact, Kandi's sales increased by nearly 12% between 2018 and 2019, even though sales to the JV Company declined throughout 2018 and the JV Company sold no EV products in the first quarter of 2019. These increased sales figures were, however, suspect.

42.    Unbeknownst to investors, to conceal the Company's prior reliance on the national subsidy program and quell investor concern, Kandi "replaced" the revenues that were previously

---

[10] Kandi Technologies Group, Inc., Annual Report (Form 10-K) (Mar. 16, 2015) at F-32 (Sales to JV Company and its subsidiaries account for 69% of Kandi's total revenue); Kandi Technologies Group, Inc., Annual Report (Form 10-K) (Mar. 14, 2016) at F-40 (Sales to JV Company and its subsidiaries account for 76% of Kandi's total revenue); Kandi Technologies Group, Inc., Annual Report (Form 10-K) (Mar. 16, 2017) at F-40 (Sales to JV Company and its subsidiaries account for 60% of Kandi's total revenue); Kandi Technologies Group, Inc., Annual Report (Form 10-K) (Mar. 16, 2018) at F-39 (Sales to JV Company and its subsidiaries account for 90.4% of Kandi's total revenue).

generated from sales to the JV Company, with purported "sales" to undisclosed related parties throughout the Class Period.

43.     While Kandi identified its "top customers" and "top suppliers" by name in its 2018 and early-2019 filings with the SEC, it did not identify two of these main customers – Jinhua Chaoneng Automobile Sales Co. Ltd. ("Chaoneng") and Zhejiang Kuke Sports Technology Co., Ltd. ("Kuke") – and one its top suppliers – Massimo Motor Sports LLC ("Massimo") – as related parties as it was required to do under SEC Rules and Generally Accepted Accounting Principles ("GAAP").[11]

44.     Further, beginning in November 2019 with the filing of the Company's 3Q 2019 Form 10-Q, Kandi began redacting the names of these undisclosed related parties, referring to them only as "Customer A," "Customer B," and "Supplier C" in an effort to ensure that investors remained in the dark about Kandi's material related party transactions.

## C.     Kandi Was Required to Disclose Related Party Transactions

45.     Defendants falsely claimed during the Class Period that the Company's quarterly and year-end financial statements sufficiently disclosed all material, related party transactions as required by SEC Regulations and GAAP. This proved not to be the case.

46.     Under the Financial Accounting Standards Board ("FASB") Accounting Standard Codification ("ASC")[12] No. 850, a public company's "[f]inancial statements shall include

---

[11] GAAP are the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. SEC rules and regulations require that publicly traded companies include financial statements that comply with GAAP in their annual and quarterly filings with the SEC. *See* § 13 of the Exchange Act (15. U.S.C. § 78); Rule 10-01(d) of Regulation S-X (17 C.F.R. § 210.10-01(d)). SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

[12] The ASCs maintained by FASB are among the standards and concepts that make up GAAP.

disclosures of material related party transactions." ASC 850-10-50-1. "Related party transactions" include those between "an entity and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." ASC 850-10-05-3.

47.    "Affiliate" includes any company that is under common control or management with the public company (*e.g.,* subsidiaries) as well as a party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity." ASC 850-10-20.

48.    "Related parties" also include "[o]ther parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests," and "[o]ther parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests." ASC 850-10-20.

49.    "Management" is defined as "[p]ersons who are responsible for achieving the objectives of the enterprise and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policymaking functions. Persons without formal titles also may be members of management." ASC 850-10-20.

50.     "Control" is defined as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity through ownership, by contract, or otherwise." ASC 850-10-20.

51.     Pursuant to GAAP, disclosures of related party transactions must include: (a) the nature of the relationship involved; (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements; (c) the dollar amount of transactions for each of the periods for which income statements are presented; and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

52.     The Company also was required to report related party transactions in order to comply with the *Reporting Objectives* as described in the Committee of Sponsoring Organizations of the Treadway Commission Report ("COSO"), *Internal Control – Integrated Framework* – 2013 (the "Framework").[13] Guidance from the Framework defines internal control as follows:

> Internal control is a process effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, ***reporting***, and compliance. (Emphasis added.)

53.     *The Reporting Objectives* set forth in the Framework state: "[t]hese pertain to internal and external financial and non-financial reporting and may encompass reliability,

---

[13] COSO was formed in 1985 by five major professional accounting associations – the American Institute of Certified Public Accountants (AICPA), American Accounting Association (AAA), Financial Executives International (FEI), Institute of Internal Auditors (IIA) and Institute of Management Accountants (IMA) – to sponsor the National Financial Information Commission (also known as the Treadway Commission after its original President, former SEC Commissioner James C. Treadway) to develop integrated guidance on internal controls. The Framework was the guidance developed by COSO.

timeliness, *transparency*, or other terms as set forth by *regulators*, *standard setters*, or the entity's policies." (Emphasis added).

54.     Although Defendants purported to disclose all material related party transactions in Defendant Kandi's annual and quarterly filings during the Class Period, Plaintiffs' investigation and the Hindenburg Report have uncovered facts demonstrating that the Company engaged in additional related party transactions that Defendants did not disclose in violation of SEC regulations and GAAP.

### 1.     Chaoneng Was an Undisclosed Related Party to Kandi

55.     Chaoneng is one of Kandi's top customers, accounting for 33%, 51% and 24% of Kandi's sales in 2018, 2019 and 2020 respectively. Chaoneng shared a key executive with Kandi and is owned by an individual with strong ties to Kandi - Hu Yiheng ("Yiheng").

56.     Yiheng has been a 30% owner of Chaoneng since 2011 and has served as an executive of that company and its legal representative since 2013. As Chaoneng's legal representative, Yiheng is authorized under the Peoples Republic of China Company Law to execute contracts and handle all transactions on behalf of the company.

57.     Yiheng is also a Kandi executive, having served as director of Kandi's "integrated office" in November 2010 and serving in key positions at companies that were owned by Kandi.

58.     Plaintiffs' investigation revealed that Yiheng served in executive positions at Microcity Electric Vehicles Service (Jinhua) Co. Ltd. ("Microcity Jinhua") and its affiliate Microcity Electric Vehicle Service (Dongyang) Co. Ltd. ("Microcity Dongyang") during the Class Period. Specifically, Yiheng served as general manager of Microcity Jinhua from at least 2017 through 2020, as its legal representative through 2020, and executive director through 2018. Yiheng also served as manager of Microcity Dongyang from 2018-2020. Both Microcity Jinhua

14

and Microcity Dongyang are wholly owned by the Service Company (also known as Microcity) – the same Kandi company that the JV Company sold EVs to as part of Kandi's subsidy scheme. *See* ¶ 30, *supra*. Between 2015-2018, Kandi owned 9.5% of Microcity and Defendant Hu owned 13%. The remaining stakeholder of Microcity is Geely – Kandi's partner in the JV Company.

59.     In addition to sharing a key executive with Kandi, Plaintiffs' investigation confirmed that between 2013 and 2019, Chaoneng reported the same telephone number (+86 (579) 8223 9276) in annual reports submitted to the State Administration for Market Regulation ("SAMR")[14] as that reported to SAMR by Zhejiang Kandi Smart Power Exchange Technology Co. Ltd. ("Kandi Smart Power"), a Kandi wholly owned subsidiary, in 2018 and 2019.

60.     Further, between 2016 and February 2021, Chaoneng reported in SAMR filings that its registered address was No. 4 Warehouse on Lots G-01-03 and G-02-01, Industrial Park District, Jinhua City – an address that is located inside Kandi's industrial complex and next door to Kandi Smart Power. Between 2015 and 2019, Kandi Smart Power also registered an address adjacent to Chaoneng.[15]

61.     Photos taken of Kandi's Jinhua industrial complex illustrate the web of related companies Kandi has organized within the compound. At the east gate of the compound, the following signs are visible (in order of appearance): Microcity Jinhua (the wholly-owned subsidiary of Microcity which was owned by Kandi, Defendant Hu, and Geely, and where Yiheng served as an executive); Microcity (owned by Kandi, Defendant Hu, and Geely); Jinhua Kandi

---

[14] SAMR is the Chinese ministry-level government agency responsible for market regulation.

[15] Since the filing of the Hindenburg Report, Chaoneng has changed its contact number to +86 (579) 8285 8295 in the SAMR annual report submitted in 2021, and changed its reported address to No. 333, Langfeng Street, Wucheng District, Jinhua City, Zhejiang Province.

Electric Vehicle Chaoneng Service Station (which appears to be related to Chaoneng); and Kandi

Electric Vehicle Maintenance Station:



62.     Kandi and Yiheng had control over Chaoneng as evidenced by Chaoneng and Kandi Smart Power (which is 100% owned by Kandi) sharing the same telephone number and locations inside Kandi's industrial complex. In addition, through Yiheng's executive roles at Chaoneng and Kandi, Yiheng and Kandi both had the ability to control and influence the management or operating policies of Chaoneng.

63.     Further, while Chaoneng purportedly engages in the wholesale and retail sales of automobiles, vehicle batteries and other automobile spare parts, no information relating to Chaoneng's wholesale and retail operations is available in the public domain. Chaoneng does not have a customs registration code in the import and export database maintained by the People's Republic of China General Administration of Customs and there are no export records for Chaoneng in third-party shipping records. Accordingly, while Chaoneng was a major customer of Kandi, making up 33% and 51% of Kandi's sales in 2018 and 2019, respectively, there is no record of the company conducting any business either within or outside of China.

64. Accordingly, as set forth above, both Kandi and Chaoneng were under common control through Yiheng during the Class Period and the companies were related parties under GAAP.

Relationship Flowchart – Jinhua Chaoneng Automobile Sales Co. Ltd. ("Chaoneng")



## 2. Kuke was an Undisclosed Related Party to Kandi

65. Kuke – a former wholly-owned subsidiary of Kandi – was Kandi's second largest customer during the Class Period. Kuke engages in the wholesale and export of recreational vehicles.

66.     Kuke's website shows the company's ties to Kandi. A review of the products listed on the website illustrates that the company appears to be exclusively selling Kandi and Jasscol[16] branded vehicles, which range from motorcycles, go-karts, all-terrain vehicles to electric cars. Although Kandi owns the "Jasscol" trademark, Kuke lists products with the brand name "Jasscol" prominently on its company website.[17]

67.     In addition, the banner of Kuke's website features an overhead image of Kandi's industrial compound in Jinhua City and displays photos showing Kandi's facilities in the "About Us" section:[18]



68.     Because Kandi is the owner of the Jasscol trademark, Kandi can control or significantly influence Kuke's operations through its ability to determine whether Kuke uses the Jasscol trademark in its marketing. Through this control and influence, Kandi can direct or cause

---

[16] Jasscol is a trademark owned by Kandi. *See* 2019 Form 10-K at 5.

[17] https://www.kukesport.com/en/product.html

[18] https://www.kukesport.com/

the direction of Kuke's management and policies which would have a direct effect on Kuke's sales and operations.

69.     In addition, Kuke's shareholders each have significant ties to Kandi. Kuke is a former Kandi subsidiary that was once owned by Defendant Hu and his son, Wangyuan Hu ("Wangyuan"), first through Zhejiang Yuanhai Investment Group ("Yuanhai Investment"), and then directly.[19] In February 2008, Kuke's ownership was transferred to two individuals, Erwa Lv ("Lv") (30%) and Jianfeng Lang ("Lang") (70%). In 2016, Lang transferred his ownership stake to Hongxian Huang ("Huang"). Lv, Lang, and Huang each held key principal positions at Kandi.

70.     For example, Lang is currently an 83% shareholder, director, and general manager at Yuanhai Investment – the entity that was previously owned by Defendant Hu and his son, was the sole shareholder of Kandi from 2003 through 2006, and was a 60% owner of Kuke from 2003 – 2005. The remaining 17% of Yuanhai Investment was owed by Xintao Hu ("Xintao").

71.     Lv was employed as a supervisor by Kandi Vehicles between 2004 and 2006. Kandi Vehicles is a wholly owned subsidiary and main operating entity of Kandi. As a supervisor, under PRC law, Lv was responsible for monitoring the board of directors and CEO, financial affairs, and compliance of rules and regulations on behalf of shareholders.[20]

72.     Lv was also a supervisor at Hangzhou Passion & Patience Commercial Management Co. Ltd. (2015-2017), a company that was 70% owned on behalf of Ling Li ("Li")

---

[19] Between August 2003 and October 2005, Kuke was 60% owned by Yuanhai Investment, which in turn was 83% owned by Defendant Hu and 17% by his son, Wangyuan. The remaining 40% of Kuke was owned by Yongkang Kandi Passenger Transportation Leasing Co. Ltd. ("Kandi Leasing"), which in turn was 90% owned by Yuanhai Investment and 10% by Ying Jinfeng, Kandi's general manager in the early 2010s. In October 2005, ownership of Kuke was transferred to Defendant Hu (60%) and his son, Wangyuan (40%). Defendant Hu and Wangyuan then transferred ownership of Kuke to Kandi in 2006.

[20] https://www.chinacourt.org/article/detail/2004/10/id/135379.shtml

by Yuanhai Investment from 2013 through 2015; and from 2015 through 2017, 35% owned by Li directly. As noted above Yuanhai Investment was originally owned by Defendant Hu and his son.

73.     Notably, Li was a supervisor at Kandi between 2003-2006 and was listed as the legal representative, executive director, and manager of Kandi Leasing in 1998 – *when Li was just 18 years old*. Li is married to Xintao, Yuanhai Investment's executive director and general manger until at least 2016. Xintao was also a shareholder in Yongkang Kandi Industrial Co. Ltd., a company where both Lv (2007-2008) and Defendant Hu (2008) served as legal representative, where Li was a supervisor (2007-2008), and where Huang served as an executive director (2007-2008). Based on Plaintiffs' investigation, it is believed that Xintao is related to Defendant Hu and/or his son, Wangyuan.

74.     Accordingly, as set forth above, Kandi and Kuke were related parties under GAAP because Kandi had the ability to control Kuke's management and its policies through Kuke's use of Kandi's Jasscol trademark and through individuals who served in roles in numerous entities owned by Kandi and Defendant Hu.

75.     In addition to Kuke being a related party to Kandi, since 2006, the majority of Kuke's sales were to customers that were also related parties to Kandi, one of which – Massimo Motor Sports LLC ("Massimo") – also sold products back to Kandi and was one of Kandi's top suppliers. The following four U.S. customers have accounted for approximately 83% of Kuke's total exports by weight: (1) Jass Motorsports Inc. ("JMotor") (from 2015-2021); (2) Kandi USA (from 2009-2015); (3) Ham Trading Inc. ("Ham Trading") (from 2006-2009); and (4) Massimo (from 2017-2021).

### 3. Massimo is an Undisclosed Related Party to Kandi

76. Massimo was not only one of Kuke's largest customers, but it was an undisclosed related party to Kandi during the Class Period *and* was one of Kandi's largest suppliers. Massimo purchased EV products indirectly from Kandi through Kuke, and then sold EV products back to Kandi.

77. Massimo, located in Garland, Texas, is a manufacturer and distributor of Utility Terrain Vehicles, All-Terrain Vehicles, mini-bikes and parts and accessories.

78. David Jianxun Shan ("Shan") was listed as Massimo's president and director as of March 2020 and has been its registered agent since its formation in 2009. Shan is also Massimo's sole member. Shan's wife, May Shan, is a manager at the company.

79. In 2006, Shan incorporated Ham Trading, another of Kuke's four major customers. Ham Trading was dissolved in 2011.

80. Notably, Shan was Chairman of Sportsman Country LLC ("SC"), a subsidiary of Kandi, as late as March 2019.[21] Shan formed SC with Johnny Tai ("Tai") in 2016.

81. In 2018, SC was fully acquired by Kandi, renamed SC Autosports LLC, and has since operated under the tradename Kandi America, which is now Kandi's major distributor in the U.S.[22] The purchase price for SC was paid to Shan and Tai in the form of restricted Kandi stock. Thus, Kandi paid no cash to acquire SC, which had recorded $1.02 million in pre-tax profit in 2017. In fact, only 171,969 restricted shares (just 10% of the purchase price) was guaranteed to Shan and Tai. The remaining 90% of the purchase price (1,547,721 restricted shares) were placed

---

[21] *See* Kandi's Form S-3 Registration Statement filed on March 25, 2019, https://www.sec.gov/Archives/edgar/data/0001316517/000121390019004777/fs3032019_kanditech.htm

[22] https://www.globenewswire.com/news-release/2018/06/04/1516212/23835/en/Kandi-Technologies-Acquires-Sportsman-Country-LLC.html; https://www.kandiamerica.com/Contact-Us/

in escrow and would be released upon SC meeting certain price targets. Specifically, in 2018, SC had to achieve a pre-tax profit of at least $2 million to release 20% of the shares; in 2019, SC had to achieve a pre-tax profit of at least $3 million to release 30% of the shares; and, in 2020, SC had to achieve a pre-tax profit of at least $4 million to release the remaining 40% of the shares.[23] While the terms of the deal made it possible for Shan and Tai to receive a portion of the escrowed shares if SC failed to achieve those conditions, if SC fell below the yearly profit target by 40% or more, the entire tranche of shares would be forfeited and returned to Kandi. Accordingly, SC could return as much as $5.3 million for Kandi in cumulative gross profit between 2018 and 2020 and Shan and Tai would never receive more than the initial 10% of the purchase price.

82.     Even after SC became a Kandi subsidiary in 2018, the company shared an address with Massimo (3101 W. Miller Road, Garland, Texas) until 2020.[24]

83.     Massimo also imported 10 shipments from Kandi Electric Vehicle (Hainan) Co. Ltd. – which is 95% owned by Zhejiang Kandi (the operating entity of Kandi) and 5% by Defendant Hu – between February and August 2020. Those shipments included K23 electric cars and lithium-ion power batteries, K27 electric cars and electric car software, and lithium-ion rechargeable batteries.

84.     Through his roles at both Massimo and SC, Shan has the power to control or influence the management and/or operating policies of both companies. Since Massimo is under common control with SC, a subsidiary of Kandi, Massimo is an undisclosed related party to Kandi.

---

[23] *See* Kandi Technologies Inc., Annual Report (Form 10-K) (Mar. 15, 2019), Exhibit 10.15, at 11-14.

[24] https://www.massimomotor.com/contact-us





### 4.    Jass Motorsports Has Significant Ties to Kandi

85.    Nearly 30% of Kuke's exports between 2015 and 2021 have been to JMotor, an entity that shared a key executive with Kandi and has significant ties to Kandi USA (a company that was owned by Defendant Hu's son, Wangyuan, until its dissolution in 2015).[25] Kandi USA is discussed in greater detail in ¶ 28, *supra*.

86.    Xiaohui Zhang ("Zhang") was Kandi USA's CFO and Secretary from 2013-2015, during the same time that he incorporated JMotor in January 2013 and served as its Vice President, Secretary and Treasurer (through at least 2018).

87.    JMotor and Kandi USA shared two different addresses at various overlapping times: 1) 10955 Arrow Route # 101, Rancho Cucamonga, CA (Kandi USA from 2009 through March 2015, JMotor from November 2013 through November 2017); and 2) 738 Epperson Drive,

---

[25] Kandi USA was one of Kandi's top customers in 2012 and owned by Defendant Hu's son, Wangyuan. Nevertheless, Kandi purposefully concealed its transactions with Kandi USA by recording the sales under the tradename "Eliteway Motorsport." *See* ¶ 28, *supra*. In 2013, Kandi disclosed that Kandi USA was a customer but continued to conceal that it was in fact, a related party.

City of Industry, CA 91748 (Kandi USA from April 2015 through January 2017, JMotor through 2017). Notably, even though Kandi USA was dissolved in 2015, its website (which was active until December 2018) listed a physical address for the company through January 2017.

88.     JMotor's and Kandi USA's websites were also suspiciously similar. For example, the "About Us" section of JMotor's website is almost identical to that on Kandi USA's pre-2019 website:[26]



89.     In addition, Kandi USA revised its website in April 2014, replacing references to "Kandi USA" with "Jass Motorsports" in prominent banner positions. Even after Kandi USA's dissolution, www.kandiusa.com remained active and continued to portray the "Jass Motorsports" banner. In December 2018, Kandi USA's website posted a message re-directing all traffic to JMotor's website at www.jmotorworld.com and the domain for www.kandiusa.com was taken offline after later 2019.

---

[26] Kandi USA website captured on November 23, 2013,
https://web.archive.org/web/20131123032042/http://www.kandiusa.com/aboutus.php

### D.    Kandi's Related-Party Transactions Were Material

90.    Kandi's sales to Chaoneng during the Class Period were quantitatively and qualitatively material and would have been significant to investors.[27] Indeed, sales to Chaoneng during the Class Period represented a significant percentage of Kandi's total gross revenue: *33%* of Kandi's total gross revenue for the year ending December 31, 2018; *61%* for 1Q 2019; *36%* for 2Q 2019; *30%* for 3Q 2019; *51%* for the year-ended December 31, 2019; *33%* for the 1Q 2020; *57%* for 2Q 2020; and *28%* for 3Q 2020. Given the magnitude of sales to Chaoneng, investors would find this information material.

91.    Similarly, Kandi's sales to Kuke during the Class Period were quantitatively and qualitatively material and would have been significant to investors. Kuke was Kandi's second largest customer during the Class Period and was using a Kandi-owned trademark to market its products. Sales to Kuke during the Class Period represented a significant percentage of Kandi's total gross revenue: *4%* for the year ending December 31, 2018; *7%* for 1Q 2019; *27%* for 2Q 2019; *30%* for 3Q 2019; *15%* for the year-ended December 31, 2019; *14%* for 1Q 2020; *15%* for 2Q 2020; and *11%* for 3Q 2020. Given the magnitude of sales to Kuke, investors would find this information material.

92.    Further, Kandi's purchases from Massimo were quantitatively and qualitatively material and Kandi's transactions with Massimo would have been significant to investors. Purchases from Massimo represented *7%* of Kandi's total purchases for year-ended December 31, 2018; *20%* for 1Q 2019; *13%* for 2Q 2019; *20%* for 3Q 2019; *11%* for the year-ended December 31, 2019; *24%* for 2Q 2020; and *27%* for 3Q 2020. Given the magnitude of purchases from

---

[27] According to SEC Staff Accounting Bulletin 99 ("SAB 99") *Materiality*, 'significant' is described as "particularly compelling…to users of the registrant's financial statements."

Massimo, investors would find it material that these purchases were made from a related party of the Company.

93.     Statement of Financial Accounting Concepts[28] No. 8 ("CON 8"), Chapter 3, *Qualitative Characteristics of Useful Financial Information*, defines materiality as:

> Materiality is entity specific. The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.[29]

94.     Further, according to SEC Staff Accounting Bulletin No. 99 (SAB 99), the use of a percentage of a numerical threshold as low as 5% may provide the basis for a preliminary assumption that a particular item on a registrant's financial statement is material.

95.     In addition to being quantitatively material, Kandi's sales to Chaoneng and Kuke and its purchases from Massimo were qualitatively material to investors because the transactions represented conflicts of interest and there was a risk that the sale and purchase terms established between the parties were not at arms-length. Investors would have found these facts to be material.

E.     **Materially False and Misleading Statements**

1.     **The March 25, 2019 False and Misleading Statements**

96.     On March 15, 2019, the first day of the Class Period, Kandi filed its report for the fiscal year ended December 31, 2018 on Form 10-K (the "2018 10-K"), which was signed by Defendants Hu and Zhu. According to the FY2018 10-K, Kandi reported $112,438,828 in net revenue during 2018.

---

[28] Statements of Accounting Concepts are broad guidelines maintained by FASB as part of the codification of GAAP.

[29] CON 8, as amended, ¶ QC11.

97.     The 2018 10-K stated the Company's related-party revenue for the 2018 was as follows:

|  | Year Ended | | | |
|---|---|---|---|---|
|  | December 31, 2018 | % of Revenue | December 31, 2017 | % of Revenue |
| REVENUES FROM UNRELATED PARTY, NET | $ 63,707,518 | 56.7% | $ 9,853,410 | 9.6% |
| REVENUES FROM JV COMPANY AND RELATED PARTY, NET | 48,731,310 | 43.3% | 92,952,211 | 90.4% |

98.     The 2018 10-K stated that "[t]he following table lists sales to related parties (other than the JV Company and its subsidiaries) for 2018, 2017, and 2016:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2018 | 2017 | 2016 |
| Service Company | - | - | 3,913,031 |
| Total | $ - | $ - | $ 3,913,031 |

99.     The 2018 10-K also contained a section entitled "Procedures for Approval of Related Party Transactions" which stated (emphasis added):

> According to the Company policy on Related-Party Transactions (the "Policy") a "Related Transaction" is "**any transaction**, includes, but not limited to, **any financial transaction**, arrangement, relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships, since the beginning of the Company's last fiscal year, or any currently proposed transaction, and **the amount involved exceeds $120,000, and in which any related party had or will have a direct or indirect material interest**". **The Policy's definition of a "Related Party" is in line with the definition set forth in the instructions to Item 404(a) of Regulation S-K promulgated by the SEC.**

> Under the Policy, The Company's proposed material related transaction with related persons shall be submitted to the Board for consideration and discussion after an independent director presents his/her approval opinion beforehand. The Audit Committee shall conduct an audit on the related-party transaction and prepare a written opinion, and can engage independent

financial advisers to issue a report as a basis for its judgment, then submit it to the Board. The Policy states that the Board meeting can be held as long as non-affiliated directors making up a majority of the Board attend, any resolution made by the Board must be approved by a majority of non-affiliated directors.

100.   The 2018 10-K also listed "[t]he Company's major customers each of whom accounted for more than 10% of our consolidated revenue" which was as follows:

| | Sales | | |
|---|---|---|---|
| Major Customers | Year Ended December 31, 2018 | Year Ended December 31, 2017 | Year Ended December 31, 2016 |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries | 43% | 90% [1] | 60% [2] |
| Jinhua Chaoneng Automobile Sales Co. Ltd. | 33% | 4% | 30% |

101.   The statements in ¶¶ 97-98 and 100 were materially false and/or misleading or omitted material facts when made because they failed to disclose (1) that Kandi's reported related party revenue did not account for Kandi's undisclosed related party transactions involving Chaoneng; (2) that Kandi and Chaoneng were related parties, a description of the relevant material transactions during the relevant time period, or the dollar amounts attributable to the transactions; and (3) that a material amount of Kandi's sales for the year-ended December 31, 2018 were with undisclosed related parties and/or parties with such a close relationship and history with Kandi that it cast doubt on the arms-length nature of the relationship. Defendants' failure to disclose the foregoing information about the material related-party transactions were a violation of GAAP, ASC 850-10-05-01.

## 2.   The May 10, 2019 False and Misleading Statements

102.   On May 10, 2019, the Company filed its report for the first quarter of 2019 on Form 10-Q (the "1Q 2019 10-Q"), which was signed by Defendants Hu and Zhu. The 1Q 2019 10-Q stated the Company's related-party revenue for the first quarter of 2019 was as follows:

|  | March 31, 2019 | % of Revenue |
|---|---|---|
| REVENUES FROM UNRELATED PARTY, NET | 16,334,963 | 90.4% |
| REVENUES FROM THE JV COMPANY AND RELATED PARTY, NET | 1,733,497 | 9.6% |

103.    Under "Note 8 – Concentrations" the 1Q 2019 10-Q listed "the Company's major customers, who accounted for more than 10% of the Company's consolidated revenue, [which] were as follows":

|  | Sales | |
|---|---|---|
| Major Customers | Three Months Ended March 31, 2019 | Three Months Ended March 31, 2018 |
| Jinhua Chaoneng Automobile Sales Co. Ltd. | 61% | - |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries | 10% | 31%[1] |

104.    The same Note listed "the Company's material suppliers, each of whom accounted for more than 10% of the Company's total purchases, [which] were as follows":

|  | Purchases | |
|---|---|---|
| Major Suppliers | Three Months Ended March 31, 2019 | Three Months Ended March 31, 2018 |
| Jiangsu Tian Peng power supply Co., Ltd. | 22% | - |
| Massimo Motor Sports, LLC | 20% | - |
| Zhejiang Kandi Supply Chain Management Co., Ltd. | 12% | - |

105.    The statements in ¶¶ 102-104 were materially false and/or misleading or omitted material facts when made because they failed to disclose (1) that Kandi's reported related party revenue did not account for Kandi's undisclosed related party transactions involving Chaoneng or Massimo; (2) that Chaoneng and Massimo were related parties to Kandi, a description of the relevant material transactions during the relevant time period, or the dollar amounts attributable to the transactions; and (3) that the majority of Kandi's sales during the quarter and a material amount

of its purchases during the quarter were with undisclosed related parties and/or parties with such a close relationship and history with Kandi that it cast doubt on the arms-length nature of the relationship. Defendants' failure to disclose the foregoing information about the material related-party transactions were a violation of GAAP, ASC 850-10-05-01.

### 3. The August 9, 2019 False and Misleading Statements

106.    On August 9, 2019, the Company filed its report for the second quarter of 2019 on Form 10-Q (the "2Q 2019 10-Q"), which was signed by Defendants Hu and Zhu. The 2Q 2019 10-Q stated the Company's related-party revenue for the second quarter of 2019 was as follows:

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | June 30, 2019 | June 30, 2018 | June 30, 2019 | June 30, 2018 |
| REVENUES FROM UNRELATED PARTY, NET | $ 20,056,696 | $ 11,618,855 | $ 36,391,659 | $ 17,351,318 |
| REVENUES FROM THE JV COMPANY AND RELATED PARTY, NET | 4,089,534 | 4,740,751 | 5,823,031 | 7,344,195 |

107.    Under "Note 8 – Concentrations" the 2Q 2019 10-Q listed "the Company's major customers, who accounted for more than 10% of the Company's consolidated revenue, [which] were as follows":

| | Sales | |
|---|---|---|
| | Three Months Ended | Three Months Ended |
| Major Customers | June 30, 2019 | June 30, 2018 |
| Jinhua Chaoeng Automobile Sales Co. Ltd. | 36% | 36% |
| Zhejiang Kuke Sports Technology Co., Ltd. | 27% | 4% |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries | 17% | 29%[1] |

108.    The same Note listed "the Company's material suppliers, each of whom accounted for more than 10% of the Company's total purchases, [which] were as follows":

|  | Purchases | |
| --- | --- | --- |
| | Three Months Ended | Three Months Ended |
| **Major Suppliers** | **June 30, 2019** | **June 30, 2018** |
| Zhejiang Kandi Supply Chain Management Co., Ltd. | 69% | |
| Massimo Motor Sports, LLC | 13% | |

109.    The statements in ¶¶ 106-108 were materially false and/or misleading or omitted material facts when made because they failed to disclose (1) that Kandi's reported related party revenue did not account for Kandi's undisclosed related party transactions involving Chaoneng, Kuke, or Massimo; (2) that Chaoneng, Kuke and Massimo were related parties to Kandi, a description of the relevant material transactions during the relevant time period, or the dollar amounts attributable to the transactions; and (3) that the majority of Kandi's sales during the quarter and a material amount of its purchases during the quarter were with undisclosed related parties and/or parties with such a close relationship and history with Kandi that it cast doubt on the arms-length nature of the relationship. Defendants' failure to disclose the foregoing information about the material related-party transactions were a violation of GAAP, ASC 850-10-05-01.

### 4.    The November 12, 2019 False and Misleading Statements

110.    On November 12, 2019, the Company filed its report for the third quarter of 2019 on Form 10-Q (the "3Q 2019 10-Q"), which was signed by Defendants Hu and Zhu. The 3Q 2019 10-Q stated the Company's related-party revenue for the third quarter of 2019 was as follows:

|  | Three Months Ended | |
| --- | --- | --- |
| | September 30, 2019 | September 30, 2018 |
| REVENUES FROM UNRELATED PARTY, NET | $ 26,968,385 | $ 14,860,034 |
| REVENUES FROM THE AFFILIATE COMPANY AND RELATED PARTY, NET | 4,720,159 | 23,135,326 |

31

111.   Under "Note 8 – Concentrations" the 3Q 2019 10-Q listed "the Company's major customers, each of whom accounted for more than 10% of the Company's consolidated revenue, [which] were as follows":

| | Sales | |
|---|---|---|
| | Three Months Ended September 30, 2019 | Three Months Ended September 30, 2018 |
| Major Customers | | |
| Customer A | 30% | 24% |
| Customer B | 30% | 4% |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries (related party) | 15% | 61% |
| Customer D | 10% | - |

112.   Notably, beginning with the filing of the Company's 3Q 2019 10-Q, Kandi began redacting the names of the Company's purported unrelated party customers, referring to them only as "Customer A," "Customer B," etc. However, a comparison between Kandi's 3Q 2018 10-Q (which identified the Company's largest customers by name and percentage of sales) and its 3Q 2019 10-Q reveals that Customer A is Chaoneng. For example, as set forth below, Kandi's 3Q 2018 10-Q reported that Chaoneng accounted for 24% of Kandi's sales during the three months ended September 30, 2018 – the same percentage that the Company attributes to Customer A for that same period in its 3Q 2019 10-Q. Since Chaoneng was the only major customer to account for 24% of Kandi's sales during 3Q 2018, Chaoneng is believed to be Customer A:

**Kandi's 3Q 2018 10-Q:**[30]

| | Sales | |
|---|---|---|
| | Three Months Ended September 30, 2018 | Three Months Ended September 30, 2017 |
| Major Customers | | |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries | 61% | 77% |
| JinhuaChaoneng Automobile Sales Co., Ltd. | 24% | 19% |

---

[30] See Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2018), at 21.

**Kandi's 3Q 2019 10-Q:**[31]

| Major Customers | Sales | |
| --- | --- | --- |
| | Three Months Ended September 30, 2019 | Three Months Ended September 30, 2018 |
| Customer A | 30% | 24% |
| Customer B | 30% | 4% |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries (related party) | 15% | 61% |
| Customer D | 10% | - |

113. As set forth below at ¶ 135, based on a similar a comparison between Kandi's 2Q 2019 10-Q and 2Q 2020 10-Q, Customer B is believed to be Kuke.[32]

114. The statements in ¶¶ 110-112 were materially false and/or misleading or omitted material facts when made because they failed to disclose (1) that Kandi's reported related party revenue did not account for Kandi's undisclosed related party transactions involving Chaoneng (a/k/a Customer A) or Kuke (a/k/a Customer B); (2) that Chaoneng and Kuke were related parties to Kandi, a description of the relevant material transactions during the relevant time period, or the dollar amounts attributable to the transactions; and (3) that the majority of Kandi's sales during the quarter were with undisclosed related parties and/or parties with such a close relationship and history with Kandi that it cast doubt on the arms-length nature of the relationship. Defendants' failure to disclose the foregoing information about the material related-party transactions were a violation of GAAP, ASC 850-10-05-01.

---

[31] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Nov. 12, 2019), at 8.

[32] Because Kuke accounted for less than 10% of Kandi's sales during the 3Q 2018, its name and the sales attributed to it were not included in the Company's 3Q 2018 10-Q. However, the comparison in ¶ 135 establishes that Customer B is Kuke.

### 5.    The April 28, 2020 False and Misleading Statements

115.    On April 28, 2020, the Company filed its report for the fiscal year ended December 31, 2019 on Form 10-K (the "2019 10-K"), which was signed by Defendants Hu and Zhu. According to the 2019 10-K, Kandi reported $135,741,336 in net revenue during FY2019.

116.    In the 2019 10-K, under a heading titled "Procedures For Approval of Related Party Transactions," it stated the following (emphasis added):

> According to the Company policy on Related-Party Transactions (the "Policy"), a "Related Transaction" is "**any transaction**, includes, but not limited to, **any financial transaction**, arrangement, relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships, since the beginning of the Company's last fiscal year, **or any currently proposed transaction**, and **the amount involved exceeds $120,000**, and in which **any related party had or will have a direct or indirect material interest**". **The Policy's definition of a "Related Party" is in line with the definition set forth in the instructions to Item 404(a) of Regulation S-K promulgated by the SEC.**
>
> Under the Policy, The Company's proposed material related transactions with related persons shall be submitted to the Board for consideration and discussion after an independent director presents his/her approval opinion beforehand. The Audit Committee shall conduct an audit on the related-party transaction and prepare a written opinion, and can engage independent financial advisers to issue a report as a basis for its judgment, then submit it to the Board. The Policy states that the Board meeting can be held as long as non-affiliated directors making up a majority of the Board attend, and any resolution made by the Board must be approved by a majority of non-affiliated directors.

117.    The Company also stated that it filed its financial statements in accordance with GAAP in the report of its independent registered public accounting firm, stating the following (emphasis added):

> In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019, and the results of their operations and their cash flows for the year ended

December 31, 2019, in **conformity with accounting principles generally accepted in the United States of America.**[33]

118.    The 2019 10-K stated the Company's related-party revenue for 2019 was as follows:

|  | December 31, 2019 | % of Revenue |
|---|---|---|
| REVENUES FROM UNRELATED PARTY, NET | $   119,879,895 | 88.3% |
| REVENUES FROM THE AFFILIATE COMPANY AND RELATED PARTY, NET | 15,861,441 | 11.7% |

119.    The 2019 10-K stated that "[f]or the year ended December 31, 2019, our major customers, in the aggregate accounted for 78% of our sales." The following were listed as sales to the Company's major customers for the year ended December 31, 2019:

|  | Sales | |
|---|---|---|
| Major Customers | Year Ended December 31, 2019 | Year Ended December 31, 2018 |
| Customer A | 51% | 33% |
| Customer B | 15% | 4% |
| Fengsheng Vehicles Technologies Group Co., Ltd. and its subsidiaries (related parties) | 12% | 43% |

120.    Kandi again redacted the names of certain of the Company's major customers and major suppliers, referring to them only as "Customer A" and "Customer B." However, a comparison between Kandi's 2018 10-K (which identified the Company's largest customers by name and percentage of sales) and its 2019 10-K reveals that Customer A is Chaoneng. For example, as set forth below, Kandi's 2018 10-K reported that Chaoneng accounted for 33% of Kandi's sales for the year ended December 31, 2018 – the same percentage that the Company attributes to Customer A for the same period in its 2019 10-K. Since Chaoneng was the only major

---

[33] *See* Kandi Technologies Inc., Annual Report (Form 10-K) (Apr. 28, 2020), at F-2.

customer to account for 33% of Kandi's sales during for the year ended December 31, 2018, Chaoneng is believed to be Customer A:

**Kandi's 2018 10-K:**[34]

| | Sales | | |
|---|---|---|---|
| **Major Customers** | **Year Ended December 31, 2018** | **Year Ended December 31, 2017** | **Year Ended December 31, 2016** |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries | 43% | %<br>90(1) | %<br>60(2) |
| Jinhua Chaoneng Automobile Sales Co. Ltd. | 33% | 4% | 30% |

**Kandi's 2019 10-K:**[35]

| | Sales | |
|---|---|---|
| **Major Customers** | **Year Ended December 31, 2019** | **Year Ended December 31, 2018** |
| Customer A | 51% | 33% |
| Customer B | 15% | 4% |
| Fengsheng Vehicles Technologies Group Co., Ltd. and its subsidiaries (related parties) | 12% | 43% |

121.    As set forth below at ¶ 135, based on a similar a comparison between Kandi's 2Q 2019 10-Q and 2Q 2020 10-Q, Customer B is believed to be Kuke.[36]

122.    The 2019 10-K also listed "the Company's material suppliers, each of whom accounted for more than 10% of our total purchases" for the fiscal year ended December 31, 2019, which were as follows:

---

[34] *See* Kandi Technologies Inc., Annual Report (Form 10-K) (Mar. 15, 2019), at 5.

[35] *See* Kandi Technologies Inc., Annual Report (Form 10-K) (Apr. 28, 2020), at 5.

[36] Because Kuke accounted for less than 10% of Kandi's sales during FY 2019, its name and the sales attributed to were not included in the Company's 2018 10-K. However, the comparison set forth in ¶ 135 establishes that Customer B is Kuke.

| | Purchases | |
| | Year Ended December 31 2019 | Year Ended December 31 2018 |
| Major Suppliers | | |
| Zhejiang Kandi Supply Chain Management Co., Ltd. | 73% | - |
| Supplier C | 11% | 7% |

123.    As set forth below at ¶ 130, based on a similar a comparison between Kandi's 1Q

2019 10-Q and 1Q 2020 10-Q, Supplier C is believed to be Massimo.[37]

124.    The statements in ¶¶ 115-120 and 122 were materially false and/or misleading or

omitted material facts when made because they failed to disclose (1) that Kandi's reported related

party revenue did not account for Kandi's undisclosed related party transactions involving

Chaoneng (a/k/a Customer A), Kuke (a/k/a Customer B), or Massimo (a/k/a Supplier C); (2) that

Chaoneng, Kuke and Massimo were related parties to Kandi, a description of the relevant material

transactions during the relevant time period, or the dollar amounts attributable to the transactions;

and (3) that the majority of Kandi's sales for year-ended December 31, 2019 and a material amount

of its purchases for the year-end December 31, 2019 were with undisclosed related parties and/or

parties with such a close relationship and history with Kandi that it cast doubt on the arms-length

nature of the relationship. Defendants' failure to disclose the foregoing information about the

material related-party transactions were a violation of GAAP, ASC 850-10-05-01.

**6.    The June 5, 2020 False and Misleading Statements**

125.    On June 5, 2020 the Company filed its report for the first quarter of 2020 on Form

10-Q (the "1Q 2020 10-Q"), which was signed by Defendants Hu and Lim. The 1Q 2020 10-Q

stated the Company's related-party revenue for the first quarter of 2020 was as follows:

---

[37] Because Massimo accounted for less than 10% of Kandi's purchases during the FY 2018, its name and the purchases attributed to were not included in the Company's 2018 10-K. However, the comparison set forth in ¶¶ 130 and 137 establishes that Supplier is Massimo.

| | Three Months Ended | |
|---|---|---|
| | March 31, 2020 | March 31, 2019 |
| REVENUES FROM UNRELATED PARTY, NET | $ 6,372,424 | $ 16,334,963 |
| REVENUES FROM THE AFFILIATE COMPANY AND RELATED PARTY, NET | - | 1,733,497 |

126.    The 1Q 2020 10-Q also listed "the Company's major customers, each of whom accounted for more than 10% of the Company's consolidated revenue, [which] were as follows":

| | Sales | |
|---|---|---|
| Major Customers | Three Months Ended March 31, 2020 | Three Months Ended March 31, 2019 |
| Customer A | 33% | 61% |
| Customer B | 14% | 7% |

127.    A comparison between Kandi's 1Q 2019 10-Q (which identified the Company's largest customers by name and percentage of sales) and its 1Q 2020 10-Q reveals that Customer A is Chaoneng. For example, as set forth below, Kandi's 1Q 2019 10-Q reported that Chaoneng accounted for 61% of Kandi's sales for the three months ended March 31 2019 – the same percentage that the Company attributes to Customer A for the same period in its 1Q 2020 10-Q. Since Chaoneng was the only major customer to account for 61% of Kandi's sales for the three months ended March 31, 2019, Chaoneng is believed to be Customer A:

**Kandi's 1Q 2019 10-Q:**[38]

| | Sales | |
|---|---|---|
| Major Customers | Three Months Ended March 31, 2019 | Three Months Ended March 31, 2018 |
| Jinhua Chaoneng Automobile Sales Co. Ltd. | 61% | - |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries | 10% | 31%[(1)] |

---

[38] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (May 10, 2019), at 20.

**Kandi's 1Q 2020 10-Q:**[39]

| | Sales | |
|---|---|---|
| | Three Months Ended March 31, 2020 | Three Months Ended March 31, 2019 |
| **Major Customers** | | |
| Customer A | 33% | 61% |
| Customer B | 14% | 7% |

128.    As set forth below at ¶ 135, based on a similar a comparison between Kandi's 2Q 2019 10-Q and 2Q 2020 10-Q, Customer B is believed to be Kuke.[40]

129.    The 1Q 2020 10-Q also listed "the Company's material suppliers, each of whom accounted for more than 10% of the Company's total purchases, [which] were as follows":

| | Purchases | |
|---|---|---|
| | Three Months Ended March 31, 2020 | Three Months Ended March 31, 2019 |
| **Major Suppliers** | | |
| Zhejiang Kandi Supply Chain Management Co., Ltd. | 60% | 12% |
| Supplier C | 27% | 20% |

130.    A comparison between Kandi's 1Q 2019 10-Q (which identified the Company's largest suppliers by name and percentage of purchases) and its 1Q 2020 10-Q reveals that Supplier C is Massimo. For example, as set forth below, Kandi's 1Q 2019 10-Q reported that 20% of the Company's purchases were from Massimo for the three months ended March 31 2019 – the same percentage that the Company attributes to Supplier C for the same period in its 1Q 2020 10-Q. Since Massimo was the only supplier to account for 20% of Kandi's purchases for the three months ended March 31, 2019, Massimo is believed to be Supplier C:

---

[39] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (June 5, 2020), at 5.

[40] Because Kuke accounted for less than 10% of Kandi's sales during the 1Q 2019, its name and the sales attributed to were not included in the Company's 1Q 2019 10-Q. However, the comparison set forth in ¶ 135 establishes that Customer B is Kuke.

**Kandi's 1Q 2019 10-Q:**[41]

| | Purchases | |
|---|---|---|
| Major Suppliers | Three Months Ended March 31, 2019 | Three Months Ended March 31, 2018 |
| Jiangsu Tian Peng power supply Co., Ltd. | 22% | - |
| Massimo Motor Sports, LLC | 20% | - |
| Zhejiang Kandi Supply Chain Management Co., Ltd. | 12% | - |

**Kandi's 1Q 2020 10-Q:**[42]

| | Purchases | |
|---|---|---|
| Major Suppliers | Three Months Ended March 31, 2020 | Three Months Ended March 31, 2019 |
| Zhejiang Kandi Supply Chain Management Co., Ltd. | 60% | 12% |
| Supplier C | 27% | 20% |

131.    The statements in ¶¶ 126-130 were materially false and/or misleading or omitted material facts when made because they failed to disclose (1) that Kandi's reported related party revenue did not account for Kandi's undisclosed related party transactions involving Chaoneng (a/k/a Customer A), Kuke (a/k/a Customer B), or Massimo (a/k/a Supplier C); (2) that Chaoneng, Kuke and Massimo were related parties to Kandi, a description of the relevant material transactions during the relevant time period, or the dollar amounts attributable to the transactions; and (3) that a material amount of Kandi's sales for the quarter and a material amount of its purchases for the quarter were with undisclosed related parties and/or parties with such a close relationship and history with Kandi that it cast doubt on the arms-length nature of the relationship. Defendants'

---

[41] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (May 10, 2019), at 21.

[42] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (June 5, 2020), at 5.

failure to disclose the foregoing information about the material related-party transactions were a violation of GAAP, ASC 850-10-05-01.

### 7.    The August 10, 2020 False and Misleading Statements

132.    On August 10, 2020 the Company filed its report for the second quarter of 2020 on Form 10-Q (the "2Q 2020 10-Q"), which was signed by Defendants Hu and Lim. The 2Q 2020 10-Q stated that the Company's related-party revenue for the second quarter of 2020 was as follows:

| | Three Months Ended | |
| | June 30, 2020 | June 30, 2019 |
| --- | --- | --- |
| REVENUES FROM UNRELATED PARTY, NET | $  19,436,120 | $  20,056,696 |
| REVENUES FROM THE AFFILIATE COMPANY AND RELATED PARTY, NET | 956 | 4,089,534 |

133.    Under "Note 8 – Concentrations," the 2Q 2020 10-Q listed "the Company's major customers, each of whom accounted for more than 10% of the Company's consolidated revenue, [which] were as follows":

| | Sales | |
| Major Customers | Three Months Ended June 30, 2020 | Three Months Ended June 30, 2019 |
| --- | --- | --- |
| Customer A | 57% | 36% |
| Customer B | 15% | 27% |

134.    A comparison between Kandi's 2Q 2019 10-Q (which identified the Company's largest customers by name and percentage of sales) and its 2Q 2020 10-Q reveals that Customer A is Chaoneng. For example, as set forth below, Kandi's 2Q 2019 10-Q reported that Chaoneng accounted for 36% of Kandi's sales for the three months ended June 30, 2019 - the same percentage that the Company attributes to Customer A for the same period in its 2Q 2020 10-Q. Since Chaoneng was the only major customer to account for 36% of Kandi's sales for the three months ended June 30, 2019, Chaoneng is believed to be Customer A:

41

**Kandi's 2Q 2019 10-Q:**[43]

| | Sales | |
|---|---|---|
| **Major Customers** | **Three Months Ended June 30, 2019** | **Three Months Ended June 30, 2018** |
| Jinhua Chaoneng Automobile Sales Co. Ltd. | 36% | 36% |
| Zhejiang Kuke Sports Technology Co., Ltd. | 27% | 4% |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries | 17% | 29%[(1)] |

**Kandi's 2Q 2020 10-Q:**[44]

| | Sales | |
|---|---|---|
| **Major Customers** | **Three Months Ended June 30, 2020** | **Three Months Ended June 30, 2019** |
| Customer A | 57% | 36% |
| Customer B | 15% | 27% |

135.    Similarly, a comparison between Kandi's 2Q 2019 10-Q (which identified the Company's largest customers by name and percentage of sales) and its 2Q 2020 10-Q reveals that Customer B is Kuke. For example, as set forth below, Kandi's 2Q 2019 10-Q reported that Kuke accounted for 27% of Kandi's sales for the three months ended June 30, 2019 - the same percentage that the Company attributes to Customer B for the same period in its 2Q 2020 10-Q. Since Kuke was the only major customer to account for 27% of Kandi's sales for the three months ended June 30, 2019, Kuke is believed to be Customer B:

---

[43] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2019), at 17.

[44] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Aug. 10, 2020), at 10.

**Kandi's 2Q 2019 10-Q:**[45]

| | Sales | |
| | Three Months Ended June 30, 2019 | Three Months Ended June 30, 2018 |
| --- | --- | --- |
| **Major Customers** | | |
| Jinhua Chaoneng Automobile Sales Co. Ltd. | 36% | 36% |
| Zhejiang Kuke Sports Technology Co., Ltd. | 27% | 4% |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries | 17% | 29%[(1)] |

**Kandi's 2Q 2020 10-Q:**[46]

| | Sales | |
| | Three Months Ended June 30, 2020 | Three Months Ended June 30, 2019 |
| --- | --- | --- |
| **Major Customers** | | |
| Customer A | 57% | 36% |
| Customer B | 15% | 27% |

136.   The 2Q 2020 10-Q also listed "the Company's material suppliers, each of whom accounted for more than 10% of the Company's total purchases, [which] were as follows":

| | Purchases | |
| | Three Months Ended June 30, 2020 | Three Months Ended June 30, 2019 |
| --- | --- | --- |
| **Major Suppliers** | | |
| Zhejiang Kandi Supply Chain Management Co., Ltd. | 59% | 69% |
| Supplier C | 24% | 13% |

137.   A comparison between Kandi's 2Q 2019 10-Q (which identified the Company's largest suppliers by name and percentage of purchases) and its 2Q 2020 10-Q reveals that Supplier C is Massimo. For example, as set forth below, Kandi's 2Q 2019 10-Q reported that 13% of the Company's purchases were from Massimo for the three months ended June 30, 2019 – the same percentage that the Company attributes to Supplier C for the same period in its 2Q 2020 10-Q.

---

[45] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2019), at 17.

[46] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Aug. 10, 2020), at 10.

Since Massimo was the only supplier to account for 13% of Kandi's purchases for the three months ended June 30, 2019, Massimo is believed to be Supplier C:

**Kandi's 2Q 2019 10-Q:**[47]

|  | Purchases | |
| --- | --- | --- |
|  | Three Months Ended | Three Months Ended |
| **Major Suppliers** | **June 30, 2019** | **June 30, 2018** |
| Zhejiang Kandi Supply Chain Management Co., Ltd. | 69% |  |
| Massimo Motor Sports, LLC | 13% |  |

**Kandi's 2Q 2020 10-Q:**[48]

|  | Purchases | |
| --- | --- | --- |
|  | Three Months Ended | Three Months Ended |
| **Major Suppliers** | **June 30, 2020** | **June 30, 2019** |
| Zhejiang Kandi Supply Chain Management Co., Ltd. | 59% | 69% |
| Supplier C | 24% | 13% |

138.    The statements in ¶¶ 132-137 were materially false and/or misleading or omitted material facts when made because they failed to disclose (1) that Kandi's reported related party revenue did not account for Kandi's undisclosed related party transactions involving Chaoneng (a/k/a Customer A), Kuke (a/k/a Customer B), or Massimo (a/k/a Supplier C); (2) that Chaoneng, Kuke and Massimo were related parties to Kandi, a description of the relevant material transactions during the relevant time period, or the dollar amounts attributable to the transactions; and (3) that a majority of Kandi's sales for the quarter and a material amount of its purchases for the quarter were with undisclosed related parties and/or parties with such a close relationship and history with Kandi that it cast doubt on the arms-length nature of the relationship. Defendants' failure to

---

[47] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2019), at 18.

[48] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Aug. 10, 2020), at 10.

disclose the foregoing information about the material related-party transactions were a violation of GAAP, ASC 850-10-05-01.

### 8.     The November 9, 2020 False and Misleading Statements

139.    On November 9, 2020 the Company filed its report for the third quarter of 2020 on Form 10-Q (the "3Q 2020 10-Q"), which was signed by Defendants Hu and Lim. The 3Q 2020 10-Q stated the Company's related-party revenue for the third quarter of 2020 was as follows:

| | Three Months Ended | |
| | September 30, 2020 | September 30, 2019 |
|---|---|---|
| REVENUES FROM UNRELATED PARTIES, NET | $    18,717,212 | $    26,968,385 |
| REVENUES FROM THE AFFILIATE COMPANY AND RELATED PARTIES, NET | 6 | 4,720,159 |

140.    Under "Note 8 – Concentrations," the 3Q 2020 10-Q also listed "the Company's major customers, each of whom accounted for more than 10% of the Company's consolidated revenue, [which] were as follows":

| | Sales | |
| Major Customers | Three Months Ended September 30, 2020 | Three Months Ended September 30, 2019 |
|---|---|---|
| Customer A | 28% | 30% |
| Customer B | 11% | 30% |
| Customer C | 11% | - |

141.    A comparison between Kandi's 3Q 2019 10-Q (which identified the Company's largest customers by name and percentage of sales) and its 3Q 2020 10-Q reveals that Customer A is Chaoneng. For example, as set forth below, Kandi's 3Q 2019 10-Q reported that Chaoneng accounted for 30% of Kandi's sales for the three months ended September 30, 2019 – the same percentage that the Company attributes to Customer A for the same period in its 3Q 2020 10-Q. Since Chaoneng was the only major customer to account for 30% of Kandi's sales for the three

months ended September 30, 2019 and 24% of sales for the three months ended September 30, 2018, Chaoneng is believed to be Customer A:

**Kandi's 3Q 2019 10-Q:**[49]

| | Sales | |
|---|---|---|
| **Major Customers** | **Three Months Ended September 30, 2019** | **Three Months Ended September 30, 2018** |
| Customer A | 30% | 24% |
| Customer B | 30% | 4% |
| Kandi Electric Vehicles Group Co., Ltd. and its subsidiaries (related party) | 15% | 61% |
| Customer D | 10% | - |

**Kandi's 3Q 2020 10-Q:**[50]

| | Sales | |
|---|---|---|
| **Major Customers** | **Three Months Ended September 30, 2020** | **Three Months Ended September 30, 2019** |
| Customer A | 28% | 30% |
| Customer B | 11% | 30% |
| Customer C | 11% | - |

142.   As set forth above at ¶ 135, based on a similar a comparison between Kandi's 2Q 2019 10-Q and 2Q 2020 10-Q, Customer B is believed to be Kuke.[51]

143.   The statements in ¶¶ 139-141 were materially false and/or misleading or omitted material facts when made because they failed to disclose (1) that Kandi's reported related party revenue did not account for Kandi's undisclosed related party transactions involving Chaoneng (a/k/a Customer A) or Kuke (a/k/a Customer B); (2) that Chaoneng and Kuke were related parties

---

[49] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Nov. 12, 2019), at 8.

[50] *See* Kandi Technologies Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2020), at 8.

[51] Kuke was previously identified as Customer B in Kandi's 3Q 2019 10-Q. Because Kuke accounted for less than 10% of Kandi's sales during the 3Q 2018, its name and the sales attributed to it were not included in the Company's 3Q 2018 10-Q. However, the comparison set forth in ¶ 135 establishes that Customer B is Kuke.

to Kandi, a description of the relevant material transactions during the relevant time period, or the

dollar amounts attributable to the transactions; and (3) that a material amount of Kandi's sales for

the quarter were with undisclosed related parties and/or parties with such a close relationship and

history with Kandi that it cast doubt on the arms-length nature of the relationship. Defendants'

failure to disclose the foregoing information about the material related-party transactions were a

violation of GAAP, ASC 850-10-05-01.

144.    Additionally, "Item 1A. Risk Factors" set forth in the Company's 3Q 2020 10-Q

stated the following regarding related party transactions (emphasis added):

> In addition, **we have adopted policies and procedures, specifically a
> Related Party Transactions Policy, to identify, review, consider and
> approve such conflicts of interest.** In general, if an affiliate of a director,
> executive officer or significant stockholder, intends to engage in a
> transaction involving us, that director, executive officer or significant
> stockholder must report the transaction for consideration and approval by
> our audit committee and any such transactions have to be conducted at
> arms-length terms. **We also follow SEC regulations and the U.S. GAAP
> in reporting related party transactions.** For example, under U.S. GAAP,
> it is permitted not to disclose a specific name of a major customer and/or
> supplier if they are not related parties to us. However, there are no
> assurances that negative media who may not have thorough understanding
> of the SEC disclosure rules and U.S. GAAP cast any incorrect critisizm [sic]
> on our disclosure.

145.    The statements in ¶ 144 were materially false and misleading when made because

Defendants were not following SEC regulations and GAAP in reporting related party transactions.

As discussed in ¶¶ 55-84 above, Chaoneng, Kuke, and Massimo were related party entities and

their transactions with Kandi required disclosure pursuant to GAAP, ASC 850-10-05-01.

## THE TRUTH IS REVEALED

146.    On November 30, 2020, Hindenburg Research issued a research report on Kandi,

stating that it had "unmasked Kandi's unnamed top customers and found that almost 64% of

Kandi's last twelve months (LTM) sales have been to undisclosed related parties."

147.     Specifically, the Hindenburg Report identified Chaoneng as Kandi's "largest customer, representing ~55% of last twelve months sales[.]" The report revealed that Chaoneng, was based in the same industrial park as Kandi, adjacent to a Kandi factory, and in "[t]he same building [that] housed another entity used by Kandi as part of a [prior] separate fake sales scheme to collect illegitimate subsidies from the Chinese government, for which it was fined and sanctioned[.]" That entity was the Service Company, referenced above in ¶ 30.

148.     The Hindenburg Report identified Kuke as Kandi's second-largest customer, accounting for 9% of LTM sales and reported that Kandi *previously owned* Kuke until 2008 (around the time of Kandi's IPO), when it was sold to two individuals. The Hindenburg Report also noted that, at the time of publication, Kuke's website homepage "features a large image of Kandi's factory, and the company's logo integrates Kandi with its corporate name. The Hindenburg Report also revealed that Kuke's website "features the brand name 'Jasscol,' which is a registered trademark *owned by Kandi*."

149.     The Hindenburg Report also identified Massimo as one of Kandi's top suppliers and reported that Massimo is "based out of Kandi's U.S. headquarters in Texas and is owned by David (Jianxun) Shan, a founder and current manager of Kandi's U.S. subsidiary." The Hindenburg Report also claimed Kandi was engaged in a circular sales scheme, in which "Massimo received product from Kandi's key 'customer' Kuke" and then sold the products back to Kandi.

150.     The Hindenburg Report also revealed that Jass Motorsports and Lil Pick Up, two of Kuke's main customers, were connected to Kandi. According to the Hindenburg Report, Jass Motorsports, who received 52% of Kuke's exports, lists 10955 Arrow Route, Suite 101, Rancho Cucamonga, California as its corporate office on its incorporation documents – the same address

that was previously identified as the registered address of Kandi USA. Jass Motorsports also shared an executive officer, Xiaohui Zhang, with Kandi USA. Similarly, the Hindenburg Report noted that Lil Pick Up accounts for 9% of Kuke's exports and rents space at 3101 West Miller Road in Garland, Texas, the headquarters of Kandi America. The Hindenburg Report also notes that Renfeng Wang, head of Lil Pick Up, has business ties to Kandi America founder and manager, David Shan.

151.    Following the release of the Hindenburg Report, Kandi's stock fell by $3.86 per share, or 28.34%, to close at $9.76 per share on November 30, 2020.

## POST-CLASS PERIOD EVENTS

152.    In response to the Hindenburg Report, Defendant Hu issued a letter to shareholders on December 7, 2020, denying the allegations. Defendant Hu's self-serving denial, however, actually served to confirm a number of allegations in the Hindenburg Report.

153.    For example, Defendant Hu admitted that Chaoneng rented office space from Kandi, was located in Kandi's industrial park complex adjacent to a Kandi factory, shared a phone number with a Kandi subsidiary, and provided maintenance services to vehicles manufactured by Kandi in the same industrial park. Defendant Hu also confirmed that Chaoneng uses Kandi's name in its signage at the industrial park and that the owner of Chaoneng (Yiheng) is a former Kandi executive.

154.    Notably, Defendant Hu did not dispute that Chaoneng is based out of the same building as Microcity (also known as the Service Company) – the entity that was used to generate fake sales in Kandi's scheme to fraudulently collect government subsidy payments through the JV Company, or that Chaoneng was "Customer A" referenced in Kandi's Class Period SEC filings.

155.    With respect to Kuke, Defendant Hu admitted it is a former Kandi subsidiary and that it has been the exclusive agent of Kandi's products in the U.S. since 2015.

156.    Defendant Hu also did not deny that Kuke incorporates Kandi's factory and corporate logo on its website, or the allegations regarding the use of the brand name "Jasscol," which is a registered trademark owned by Kandi. Defendant Hu also did not deny that Kuke was "Customer B" referenced in Kandi's Class Period SEC filings or that Kuke was buying from Kandi and selling back to Massimo and JMotor – other undisclosed related parties to Kandi.

157.    Lastly, Defendant Hu did not deny that Massimo was 'Supplier C' as referenced in Kandi's Class Period SEC filings.

## ADDITIONAL SCIENTER/FALSITY ALLEGATIONS

158.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading when made.

159.    Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.

160.    ***Kandi's core business is the sale of EV parts and EV products***. Defendants' misleading statements about Kandi's revenue, major customers and major suppliers related to the heart of its business and played a significant role in operations and profitability.

161.    ***Timing of the increase in undisclosed related party sales.*** Defendants' sales of EV parts to undisclosed related parties Chaoneng and Kuke suspiciously increased at the same time Kandi's revenue from the JV Company and the Service Company declined as a result of the

Chinese government's adjustments to the EV subsidy program. Defendants were motivated to conceal the Company's reliance on the subsidy program (and its manipulation of the program). Had Defendants disclosed that its major customers were all related parties, the market would have viewed the transactions and the associated revenue attributable to the transactions with more skepticism and would have questioned the arms-length nature of the relationships.

162.     ***The magnitude of the related party transactions.*** Chaoneng and Kuke made up the majority of Kandi's sales during the Class Period. Indeed, Chaoneng represented 57% of Kandi's total sales in the first half of 2020. The magnitude of sales attributed to these customers support a finding of scienter.

163.     ***Defendant Hu has direct knowledge of the related party relationships between Kandi, Chaoneng and Kuke***. Defendant Hu has first-hand knowledge of the various related party entities through his and his son's personal ownership stakes in, as well as Kandi's ownership stakes in, the related parties. For example, Kuke was a former Kandi subsidiary that was owned by Defendant Hu and his son while Defendant Hu was CEO of Kandi. Further, Yiheng (30% owner of Chaoneng) worked for Defendant Hu at Kandi and held key positions at two companies that were owned by Defendant Hu and Kandi through 2018.

## LOSS CAUSATION/ECONOMIC LOSS

164.     During the Class Period, as detailed herein, the price of Kandi common stock was artificially inflated due to Defendants' misleading public statements. When Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Kandi common stock fell as a result.

165.     As a result of their purchases of Kandi common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

166.     The decline in the price of Kandi common stock after the corrective disclosure on November 30, 2020 was a direct result of Defendants' misrepresentations being revealed to investors and the market.

167.     The decline in the price of Kandi common stock was also the result of the manifestation and materialization of the risks concerning Kandi's concealed related party transactions.

168.     Defendants' materially false and misleading statements relate to the identification and approval of undisclosed related party transactions with affiliates of the Company and entities that could both significantly influence – and be significantly influenced by – the Company. These related parties were major customers and suppliers of Kandi.

169.     The corrective disclosure on November 30, 2020 revealed the identities of these major customers and suppliers and pointed out the ways in which they were related parties to Kandi.

170.     After the corrective disclosure on November 30, 2020, Kandi stock fell $3.86 per share, or 28.34%, to close at $9.76 per share on the same day.

171.     The timing and magnitude of the price decline in Kandi securities negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' misstatements and omissions and the subsequent

significant decline in the value of Kandi securities when Defendants' misrepresentations were revealed.

## CLASS ACTION ALLEGATIONS

172.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or acquired Kandi common stock during the Class Period and who were damaged upon the revelation of the alleged corrective disclosure (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

173.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on NASDAQ. While the exact number of Class member is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

174.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that are complained of herein.

175.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

176.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

     a.    whether Defendants' acts as alleged herein violated the federal securities laws;

     b.    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the operations, management and undisclosed related parties of the Company;

     c.    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

     d.    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

     e.    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

     f.    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

     g.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

177.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of the individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

178.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    Defendants made public misrepresentations and/or failed to disclose material facts during the Class Period

b.    the omissions and misrepresentations were material;

c.    the Company's securities are traded on an efficient market;

d.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

e.    Plaintiffs and members of the Class purchased the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

f.    unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

179.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

180.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2340 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose that information, as detailed above.

## COUNT I

### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants)

181.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

182.    This Count is asserted against the Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

183.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Kandi securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

184.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Kandi securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

185.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Kandi's financial well-being and prospects, as specified herein.

186.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Kandi's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Kandi and its business operations and future prospects in light of

the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

187. By virtue of their positions at Kandi, each of the Individual Defendants had actual knowledge of the materiality false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain an disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Defendants. Said acts and omissions of the Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

188. Information showing that the Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Defendants' knowledge and control. As the senior managers and/or directors of Kandi, the Defendants had knowledge of the details of Kandi's internal affairs.

189. The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Kandi. As officers and/or directors of a publicly-held company, the Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Kandi's business, operations, future financial condition and future prospects. As a result of the aforementioned false and misleading reports, releases and public statements, the market price of Kandi securities was artificially inflated throughout the Class

Period. In ignorance of the adverse facts concerning Kandi's business and financial condition which were concealed by the Defendants, Plaintiffs and other members of the Class purchased or otherwise acquired Kandi securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for securities and/or upon statements disseminated by the Defendants, and were damaged thereby.

190.    During the Class Period, Kandi securities were traded on an active and efficient market. Plaintiffs and other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Kandi common stock at prices artificially inflated by the Defendants wrongful conduct. Had Plaintiffs and the other members of the Class and the marketplace known the truth, they would not have purchased or otherwise acquired their Kandi securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

191.    By virtue of the foregoing, the Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

192.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants)**

193.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

194.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

195.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's operations, and to correct promptly any public statements issued by the Company which were materially false or misleading.

196.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

197.    The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or being directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the

Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

198.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class Representatives and their counsel as Class Counsel;

B.    Finding Defendants liable for the misconduct set forth herein;

C.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

D.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest;

E.    Awarding Plaintiffs their reasonable attorneys' fees, expert fees and other costs; and

F.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 27, 2021

Respectfully Submitted,

**LEVI & KORSINSKY, LLP**

/s/ Gregory M. Nespole
Gregory M. Nespole
Daniel Tepper
Correy A. Kamin
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
gnespole@zlk.com
dtepper@zlk.com
ckamin@zlk.com

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Stephanie M. Beige (*pro hac vice forthcoming*)
Peter J. Harrington
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Fax: (212) 779-3218
bernstein@bernlieb.com
beige@bernlieb.com
pharrington@bernlieb.com

***Co-Lead Counsel for Lead Plaintiffs and the Proposed Class***