UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LEONEL VALDES, individually and on behalf of
all others similarly situated,

Plaintiffs,

v.

KANDI TECHNOLOGIES GROUP, INC., HU
XIAOMING, JEHN MING KIM, MEI BING, and
ZHU XIAOYING,

Defendants.

**MEMORANDUM AND ORDER**

20-cv-6042 (LDH) (AYS)

LASHANN DEARCY HALL, United States District Judge:

Leonel Valdes, individually and on behalf of all other similarly situated individuals

("Plaintiffs"), brings this putative class action against Hu Xiaoming, Jehn Ming Lim, Mei Bing,

Zhu Xiaoying (collectively the "Individual Defendants"), and Kandi Technologies Group, Inc.

("Kandi" or, together with the Individual Defendants, "Defendants"), asserting claims for

violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act").  Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to

dismiss the Amended Complaint in its entirety.

**BACKGROUND**[1]

### I.    The Parties

Kandi designs, produces, manufacturers, and distributes electric vehicles ("EV"s), EV

parts, and off-road vehicles.  (Am. Class Action Compl. ("Am. Compl.") ¶ 23, ECF No. 60.)

Kandi is headquartered in China, and its shares trade on NASDAQ under the ticker symbol

---

[1] The following facts are taken from the Amended Complaint and are assumed to be true for the purpose of this memorandum and order, unless otherwise indicated.

"KNDI."  (*Id.* ¶¶ 2, 15.)  Plaintiffs assert claims on behalf of Kandi shareholders who purchased KNDI between March 15, 2019 and November 27, 2020 (the "Class Period").  (*Id.* ¶ 1.) Defendant Hu Xiaoming ("Hu") has served as Kandi's Chief Operating Officer since 2007, and Defendant Zhu Xiaoying ("Zhu") served as interim Chief Financial Officer from September 2019 through May 2020.  (*Id.* ¶¶ 16, 18.)  Defendant Mei Bing ("Mei") served as Kandi's Chief Financial Officer from November 2016 through January 2019.  (*Id.* ¶ 19.)  Mei also served as a director at Kandi from December 2016 through January 2019.  (*Id.*)  Defendant Jehn Ming Lim ("Lim") has served as Kandi's Chief Financial Officer since May 2020.  (*Id.* ¶ 17.)

## II.   Chinese Subsidy Scheme

Starting in 2013, Kandi engaged in a scheme to receive fraudulent subsidies from the Chinese government.  (*Id.* ¶ 29.)  Kandi did so by establishing a joint venture ("JV Company") in which Kandi owned 50%.  (*Id.*)  The JV Company manufactured EVs and sold them to a third company (the "Service Company"), partly owned by Kandi and Hu.  (*Id.* ¶ 30.)  The JV Company received subsidies for manufacturing the EVs, and the Service Company received subsidies from local governments for purchasing the EVs.  (*Id.*)  In 2016, an investigation from the Chinese government revealed that thousands of EVs sold by the JV Company sat idle in a parking lot, all while Kandi collected subsidies.  (*Id.* ¶¶ 31–32.)  Importantly, the JV Company was Kandi's top customer from 2014 through 2017, representing between 60% and 90.4% of its sales.  (*Id.* ¶ 40.)  On March 13, 2017, Kandi announced that its financial statements for 2014 through 2016 needed to be restated and should no longer be relied upon.  (*Id.* ¶¶ 33–34.)  Kandi issued restatements that addressed accounting for notes receivable and payable, its treatment and disclosures regarding related party transactions, and its reporting of taxes.  (*Id.*)

### III. Revenue Replaced with Related Party Transactions

According to Plaintiffs, while revelation of the subsidy scheme should have had a substantial negative impact on Kandi's revenue, Kandi nonetheless continued reporting relatively stable EV sales. (*Id.* ¶ 40.) Kandi did so, Plaintiffs maintain, by replacing revenue previously generated from sales to the JV Company, with sales to four undisclosed related parties: Chaoneng, Kuke, Massimo, and Jass Motorsports. (*See id.* ¶¶ 42–43.)

### A. <u>Chaoneng</u>

Chaoneng is one of Kandi's top customers and accounted for 33%, 51% and 24% of Kandi's sales in 2018, 2019 and 2020 respectively. (*Id.* ¶ 55.) Hu Yiheng ("Yiheng") has been a 30% owner of Chaoneng since 2011 and has served as its legal representative since 2013. (*Id.* ¶ 56.) Yiheng served as general manager of Microcity Electric Vehicles Service (Jinhua) Co. Ltd. ("Microcity Jinhua") from at least 2017 through 2020, as its legal representative through 2020, and as its executive director through 2018. (*Id.* ¶ 58.) Yiheng also served as manager of Microcity Electric Vehicle Service (Dongyang) Co. Ltd. ("Microcity Dongyang") from 2018–2020. (*Id.*) Both Microcity Jinhua and Microcity Dongyang are wholly owned by Microcity. (*Id.*) From 2015 to 2018, Kandi owned 9.5% of Microcity, and Defendant Hu owned 13%. (*Id.*) Plaintiffs' investigation confirmed that Chaoneng and Zhejiang Kandi Smart Power Exchange Technology Co. Ltd. (a Kandi wholly owned subsidiary) reported the same telephone number in annual reports to Chinese regulators. (*Id.* ¶ 59.) In addition, photographs from Kandi's Jinhua industrial complex depict "the web of related companies" Kandi has organized within the compound by showing one industrial building with signs for Microcity Jinhua, Microcity, an EV service station that appears to be related to Chaoneng, and a Kandi EV maintenance station. (*Id.* ¶ 61.)

### B. <u>Kuke</u>

Kuke, a former wholly owned subsidiary of Kandi that sells recreational vehicles, was Kandi's second largest customer during the Class Period.  (*Id.* ¶ 65.)  Kuke's website predominantly lists products with the brand name "Jasscol," which is a trademark owned by Kandi.  (*Id.* ¶ 66.)  The banner on Kuke's website features an overhead image of Kandi's industrial compound in Jinhua City, and shows Kandi's facilities in the "About Us" section on the website.  (*Id.* ¶ 67.)  Plaintiffs further claim that "Kuke's shareholders each have significant ties to Kandi."  (*Id.* ¶ 69.)  For example, Kuke is a former Kandi subsidiary that was once owned by Hu and his son.  (*Id.*)  In February 2008, Kuke's ownership was transferred to two individuals:  Jianfeng Lang ("Lang") and Era Lv ("Lv").  (*Id.*)  In 2016, Lang transferred his ownership stake to Hongxian Huang ("Huang").  Lang is currently an 83% shareholder, director, and general manager at Zhejiang Yuanhai Investment Group ("Yuanhai Investment"), which is the entity previously owned by Hu and his son, was the sole shareholder of Kandi from 2003 to 2006, and was a 60% owner of Kuke from 2003 to 2005.  (*Id.* ¶ 70.)

Lv was a supervisor for Kandi Vehicles, a wholly owned Kandi subsidiary, from 2004 to 2006.  (*Id.* ¶ 71.)  There, Lv was responsible for monitoring the board of directors and CEO, financial affairs, and compliance of rules and regulations on behalf of shareholders.  (*Id.*)  From 2015 to 2017, Lv was a supervisor at Hangzhou Passion & Patience Commercial Management Co. Ltd., which was owned 70% on behalf of Ling Li ("Li") by Yuanhai Investment from 2013 to 2015, and 35% directly by Li from 2015 to 2017.  (*Id.* ¶ 72.)  Li was a supervisor at Kandi from 2003 to 2006, and was listed as the legal representative, executive director, and manager of Kandi Leasing in 1998.  (*Id.* ¶ 73.)  Li is also married to Xintao Hu ("Xintao"), who served as Yuanhai Investment's executive director and general manger until at least 2016.  (*Id.*)  In

addition, Xintao was a shareholder in a company where Lv and Hu each served as legal representative from 2007 to 2008 and in 2008, respectively, and where Huang served as an executive director from 2007 to 2008.  (*Id.*)

## C. **Massimo**

Massimo was one of Kandi's largest suppliers and one of Kuke's largest customers.  (*Id.* ¶ 76.)  David Jianxun Shan ("Shan") is Massimo's sole member and has been its registered agent since its formation in 2009.  (*Id.* ¶ 78.)  In 2016, Shan formed Sportsman Country LLC ("SC") with Johnny Tai.  (*Id.* ¶ 80.)  In 2018, Kandi acquired SC, which has since operated under the tradename Kandi America.  (*Id.* ¶ 81.)  Shan was Chairman of SC "as late as March 2019."  (*Id.* ¶ 80.)  After SC became a Kandi subsidiary in 2018, SC shared an address with Massimo until 2020.  (*Id.* ¶ 82.)  Massimo imported 10 shipments from Kandi Electric Vehicle (Hainan) Co. Ltd.—which is 95% owned by Zhejiang Kandi (the operating entity of Kandi) and 5% by Hu— between February and August 2020.  (*Id.* ¶ 83.)

## D. **Jass Motorsports**

Jass Motorsports is a California based powersports distributor.  (*Id.* ¶ 88.)  From 2015 to 2021, Jass Motorsports accounted for nearly 30% of Kuke's exports.  (*Id.* ¶ 85.)  Xiaohui Zhang ("Zhang") incorporated Jass Motorsports in 2013.  (*Id.* ¶ 86.)  Until its dissolution in 2015, Zhang served as Chief Financial Officer and Secretary for Kandi USA.  (*Id.*)  Jass Motorsports and Kandi USA shared the same addresses during overlapping times before November 2017.  (*Id.* ¶ 87.)  The companies' websites were "suspiciously similar," particularly when comparing their "About Us" sections.  (*Id.* ¶ 88.)  Kandi USA revised its website in April 2014, replacing references to "Kandi USA" with "Jass Motorsports" in prominent banner positions.  (*Id.* ¶ 89.)  Kandi USA's website remained active after its dissolution and continued to depict a "Jass

5

Motorsports" banner.  (*Id.*)  In December 2018, Kandi USA posted a message on its website, redirecting all traffic to Jass Motorsports' website.  (*Id.*)

### IV.    Hindenburg Report

On November 30, 2020, Hindenburg Research published a report (the "Hindenburg Report") titled "Kandi: How This China-Based NASDAQ Listed Company Used Fake Sales, EV Hype to Nab $160 Million From U.S. Investors."  (*Id.* ¶ 4.)  The Hindenburg Report opines, among other things, that 64% of Kandi's sales over the last twelve months had been to undisclosed related parties.  (*Id.* ¶ 146.)  Following publication of the Hindenburg Report, the price of KNDI fell 28% per share, and several lawsuits against Kandi ensued.  (*Id.*)  On December 7, 2020, Hu issued a letter to Kandi shareholders, denying the allegations in the Hindenburg Report.  (*Id.* ¶ 152.)  Plaintiffs initiated this action following release of the Hindenburg Report and Plaintiffs' own investigation into the alleged related party transactions. (*Id.* ¶ 54.)

### V.    Alleged Misstatements and Omissions

Plaintiffs allege materially false and misleading statements in connection with the following financial disclosures during the Class Period:

- Form 10-K for the fiscal year ended December 31, 2018 (filed on March 15, 2019):
- Form 10-Q for the quarter ended March 31, 2019 (filed on May 10, 2019):
- Form 10-Q for the quarter ended June 30, 2019 (filed on August 9, 2019);
- Form 10-Q for the quarter ended September 30, 2019 (filed on November 12, 2019);
- Form 10-K for the fiscal year ended December 31, 2019 (filed on April 28, 2020);
- Form 10-Q for the quarter ended March 31, 2020 (filed on June 5, 2020);
- Form 10-Q for the quarter ended June 30, 2020 (filed on August 10, 2020); and
- Form 10-Q for the quarter ended September 20, 2020 (filed on November 9, 2020).

(*Id.* ¶¶ 96–145.)  According to Plaintiffs, these statements failed to (1) account for transactions with the above entities as related party revenue; (2) provide material descriptions of the related party transactions; and (3) disclose that a majority of sales during the respective reporting

periods was with related parties.  (*Id.* ¶¶ 101, 105, 109, 114, 124, 131.)  In addition, starting with Kandi's Form 10-Q filed for the third quarter of 2019, Kandi began redacting the names of major customers and suppliers, referring to them only as "Customer A," "Supplier A," etc.  (*Id.* ¶ 112.) Kandi did so, Plaintiffs allege, to ensure that investors remained in the dark about Kandi's material related party transactions.[2]  (*Id.* ¶ 44.)  Plaintiffs maintain that each of these statements violates SEC regulation and generally accepted accounting principles ("GAAP").[3]

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct.  *Id.*  While this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss, *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999).  Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true."  *Id.* (citations omitted).

---

[2] Plaintiffs allege to have uncovered the identities of Kandi's anonymized customers and supplier by comparing the redacted names to prior financial statements.  (*Id.* ¶¶ 120, 130, 135.)

[3] GAAP, and specifically Financial Accounting Standards Board ("FASB") Accounting Standards Codification 850-10-20 ("ASC 850"), requires corporations to disclose "related party transactions," including the nature of the relationship involved.  GAAP defines a related party as one which "controls or can significantly influence the management or operating policies of the other to the extent that one of the transacting parties might be prevented from fully pursuing its own interest."  ASC 850.

**DISCUSSION**

"To state a claim on which relief can be granted under § 10(b) and Rule 10b–5, a plaintiff must plead, inter alia, that in connection with the purchase or sale of securities, the defendant made a false representation as to a material fact, or omitted material information, and acted with scienter." *S. Cherry St., LLC v. Hennessee Grp.*, 573 F.3d 98, 108 (2d Cir. 2009).  As an initial matter, Defendants argue that Plaintiffs' claims should be dismissed because Defendants cannot be liable for the opinions contained in the Hindenburg Report.  (Mem. L. Supp. Defs.' Mot. Dismiss ("Defs.' Mem."), 2–3, 9, ECF No. 69-3); (Reply Mem. L. Further Supp. of Defs.' Mot. to Dismiss ("Defs.' Reply Mem."), 1–3, ECF No. 69-5); (Defs.' Supp. Sub. Further Supp. Their Mot. to Dismiss ("Defs.' Supp. Mem."), 1–3, ECF No. 72-1.)  Defendants plainly misapprehend the complaint.  Plaintiffs do not allege any misstatement from the Hindenburg Report.  Instead, Plaintiffs allege that the Hindenburg Report revealed the falsity in Kandi's *own* financial statements.  (Am. Compl. ¶ 146); (*see also* Lead Pls.' Mem. L. Opp. Defs.' Mot. Dis. ("Pls'. Mem.") at 14, ECF No. 69-4) (acknowledging "the Complaint does not attribute statements in the Hindenburg Report to Defendants" because "it is *Defendants'* misstatements and omissions in Kandi's SEC filings that are at issue").  And there can be no question that such misstatements, if they exist, could be subject to a securities fraud claim.

Indeed, Defendants' own citations reinforce the undisputed point that, while a company cannot be held liable for the statements of others, it is nonetheless responsible for its own financial disclosures.  *See Janus Cap. Grp. v. First Derivative Traders*, 564 U.S. 135, 147–48 (2011) (holding that investment adviser and parent capital group could not be held liable for statements made by investment fund); *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 158 (2d Cir. 2010) (holding that law firm and lawyer could not be liable for statements

attributable to brokerage firm); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 17, 26 (S.D.N.Y. 2016) (alleging false statements in company's "SEC filings and press releases, and on earnings calls or at public events," following revelations of company culture in the media).

At the same time, the Court recognizes that the report was not issued by a wholly disinterested party. The Hindenburg Report is a report by a short seller "with an economic interest in driving down the company's stock price." *In re DraftKings Inc. Sec. Litig.*, No. 21 CIV. 5739 (PAE), 2023 WL 145591, at *18 (S.D.N.Y. Jan. 10, 2023). As such, allegations based on the report "must be considered with caution." *Id.*; *see also Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (collecting cases and noting that short sellers "have an obvious motive to exaggerate the infirmities of the securities in which they speculate"). While the Court approaches Plaintiffs' allegations based on the Hindenburg Report with caution, dismissal is not required simply because Plaintiffs relied on a report authored by a short seller.

Nonetheless, Plaintiffs must also prove that Defendants possessed the requisite state of mind in committing the alleged fraud. The Private Securities Litigation Reform Act ("PSLRA") requires a plaintiff to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This state of mind is known as "scienter," defined by the Supreme Court as "a mental state embracing intent to deceive, manipulate, or defraud." *S. Cherry St., LLC*, 573 F.3d at 108 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). The requisite scienter can be established by alleging facts to show either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase*

*Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Defendants maintain that Plaintiffs have failed to sufficiently allege scienter under either theory.

## I.    Scienter by Motive and Opportunity

To show that Defendants had the requisite motive and opportunity, Plaintiffs must allege they "benefitted in some concrete and personal way from the purported fraud." *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)).  In other words, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.* (citations omitted).

According to the Amended Complaint, once Kandi ceased receiving subsidies from the Chinese government, Defendants replaced revenue previously generated from the subsidy scheme with sales to undisclosed related parties.  (Am. Compl. ¶¶ 37–42, 161); (Lead Pls.' Supp. Sub. in Further Opp. To Defs.' Mot. to Dismiss ("Pls.' Supp. Opp.") at 3–4, ECF No. 73.)  Doing so allowed Kandi to report relatively stable EV sales—despite the JV Company ceasing to sell EVs—and concealed the extent that Kandi relied on the fraudulently-collected subsidies.  (Am. Compl. ¶ 40–42); (Pls.' Supp. Opp. at 4.)  However, none of the motives that Plaintiffs allege are sufficient to establish scienter.  Courts have routinely held that desire to avoid government scrutiny or to maintain profitability is insufficient to establish scienter because neither is "concrete" or "personal" to the defendants.  *See S. Cherry St., LLC*, 573 F.3d at 109 (desire to "sustain the appearance of corporate profitability" insufficient to establish scienter); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 242 (S.D.N.Y. 2022) ("The desire to maintain the profitability of the investment and to avoid governmental and regulatory scrutiny are neither concrete nor personal to the defendants and are common to all corporate officers.").

Accordingly, because the motives alleged by Plaintiffs could apply to all Kandi executives, they are insufficient to establish scienter.

In seeking to avoid this conclusion, Plaintiffs directs the Court to a recent decision issued by the Southern District of New York in a separate securities class action involving Kandi.  In *Venkataraman v. Kandi Techs. Grp., Inc.*, the plaintiffs alleged that Kandi failed to disclose related party transactions with the Service Company central to the Chinese subsidy scheme.  No. 20-CIV-8082, 2022 WL 4225562, at *1 (S.D.N.Y. Sept. 13, 2022); (*see supra* at 2.)  Kandi owned 50% of the JV Company, which sold parts to the Service Company in which Kandi owned 9.5% and Hu owned 13%.  *Venkataraman*, 2022 WL 4225562, at *1.  Transactions between Kandi and the Service Company allowed both companies to "double dip" into subsidies from the Chinese government.  *Id.* at *7.  Accordingly, the *Venkataraman* court found scienter by motive and opportunity because "[s]uch specific incentives—on the part of both Kandi and Hu personally—to double dip and avoid government scrutiny provide a specific motive to conceal these related-party transactions, disclosure of which would have revealed the scheme." *Id.*

Whereas the *Venkataraman* court critically relied on Kandi and Hu's ability to "double dip" based on their ownership interest in the Service Company, Plaintiffs fail to plead that Defendants had any ownership interests in the alleged related parties here, at least during the Class Period.  With respect to Chaoneng, the related link is a non-party, Hu Yiheng, who previously worked for a Kandi subsidiary and went on to work for Kandi customer Chaoneng. (Am. Compl. ¶¶ 55–64.)  Kuke was once owned by Hu and his son, but ownership transferred in 2008, long before the alleged Class Period.  (*Id.* ¶¶ 65–75.)  For Massimo, the related link is an outside party, David Shan, who chairs a company under common control with another Kandi

subsidiary.  (*Id.* ¶¶ 76–84.)  And with respect to Jass Motorsports, the related link is another individual, Xiaohui Zhang, who once served as an executive for both a Kandi subsidiary and customer.  (*Id.* ¶¶ 85–89.)  Thus, Defendants were unable to "double dip" from Kandi's sales to the alleged related parties, unlike Kandi and Hu, who directly profited from sales by the JV Company to the Service Company, which both partially owned.  *Venkataraman*, 2022 WL 4225562, at *7.

Nonetheless, Plaintiffs appear to argue that *Venkataraman* supports a finding of scienter because, as in that case, Defendants "desire[d] to avoid detection" of related party transactions.  *See* Supp. Opp. at 4.  But *Venkataraman* rested not just on the desire to avoid scrutiny.  Critically, the court also relied on the ownership interests that Kandi and Hu had in the related party, which allowed both to double dip.  2022 WL 4225562, at *7.  In fact, in discussing *Venkataraman*, Plaintiffs appear to acknowledge that the decision rested on both rationales.  *See* Supp. Opp. at 4 ("In *Venkataraman*, Kandi and Hu were alleged to be motivated not only to 'double dip' into subsidies from the Chinese government to which they were not entitled, but also to avoid government scrutiny.").  Absent allegations of direct ownership interest here, Plaintiffs simply allege that Defendants sought to avoid government scrutiny, which is insufficient to establish scienter.  *See Turquoise Hill*, 625 F. Supp. 3d at 235 ("The motive to avoid governmental inquiry can be ascribed to any company—every corporate executive would prefer that his or her company not be investigated whether the investigation is justified or not.").  Accordingly, the Amended Complaint fails to plead scienter by motive and opportunity.[4]

---

[4] Although Defendants' briefing focuses on the insufficiency of Plaintiffs' alleged motive, the Court agrees with Plaintiffs that the Amended Complaint pleads sufficient opportunity to commit the alleged fraud.  (Am. Compl. ¶ 21); *see In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 74 (E.D.N.Y. 1999) ("Plaintiffs also adequately allege opportunity, as defendants . . .  were the three most senior officers, who participated in the drafting, preparation, and/or approval of the financial reports, press releases, shareholder communications, and SEC

## II.     Scienter by Recklessness

Scienter can also be shown by alleging "strong circumstantial evidence of conscious misbehavior or recklessness." *See ECA, Local*, 553 F.3d at 198.  Recklessness in this context means "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC*, 573 F.3d at 109.  To constitute recklessness, the conduct must be "at the least . . . highly unreasonable and . . . represent[ ] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it[.]"  *Id.* (internal quotations and citations omitted).  Plaintiffs advance six arguments as to how the Amended Complaint alleges scienter by recklessness, none of them persuasive to the Court.

### A.  Redaction of Kandi's Customers and Supplier

*First*, Plaintiffs argue that Defendants "deliberately concealed" related party transactions by redacting the identities of Kandi's largest customers and supplier.  (Pls.' Mem. at 16.)  Starting with Kandi's Form 10-Q filed for the third quarter of 2019, Kandi began anonymizing the names of major customers and suppliers, referring to them only as "Customer A," "Supplier A," etc.  (*Id.* ¶ 112.)  In arguing these redactions present "classic evidence of scienter," Plaintiffs cite to three cases finding scienter by recklessness.  (Pls.' Mem. at 16.)

The cases cited by Plaintiffs are inapposite for several reasons, not the least of which because they fail to address redactions of customer names.  Plaintiffs first cite to *In re Livent, Inc. Sec. Litig.*, where the Southern District of New York found scienter based on "a series of deliberate acts—and knowledge of such acts—designed to deceive the public."  F. Supp. 2d 194,

---

filings at issue.").  That said, to prove scienter Plaintiffs must plead motive *and* opportunity, the former of which Plaintiffs have failed to show here.

201, 215 (S.D.N.Y. 1999).  More specifically, the defendants were "alleged to have understated expenses in order to inflate earnings; recognized as revenue what in reality were loans; portrayed unsuccessful theatrical productions as profitable; and fabricated earnings results to meet quarterly and annual projections the Company provided to Wall Street analysts."  *Id.* at 201. Importantly, while the *Livent* court found scienter based on the "series of deliberate acts" taken to deceive the public, the court never intimated that any single act was sufficient to establish scienter.  *See id.* at 215.  Nor can this Court infer that the redactions, standing alone, establish scienter.

Next, Plaintiffs cite to *Setzer v. Omega Healthcare Invs., Inc.*, where the Second Circuit found scienter after an investor in healthcare facilities failed to disclose that it loaned $15 million to its financially struggling tenant.  968 F.3d 204, 214–15 (2d Cir. 2020).  Failure to disclose the loan "gave a false impression of the financial health of one of [the investor's] largest assets."  *Id.* Importantly, the Second Circuit has since interpreted *Setzer* to represent an "obviously nefarious scheme" where the company deliberately withheld critical information from the investing public. *Bonine v. Guccione*, No. 21-955, 2022 WL 102073, at *2 (2d Cir. Jan. 11, 2022) (distinguishing *Setzer* to find no scienter).  Here, even if the redactions were improper, the Court cannot conclude they represent an "obviously nefarious scheme."  Unlike the loan in *Setzer* that had never been disclosed to the public, Kandi previously shared the redacted customer names in prior financial statements—in fact, this is how Plaintiffs were able to uncover their identities, by comparing the redacted names to prior financial statements.  (Am. Compl. ¶¶ 120–23.)  Kandi, therefore, is not alleged to have deliberately withheld adverse information as part of an "obviously nefarious scheme" like in *Setzer*.  968 F.3d at 214.  In any event, Kandi did not begin

redacting customer names until halfway through the Class Period, so the redactions have no bearing on scienter for the unredacted financial statements.  (*Id.* ¶ 112.)

Finally, Plaintiffs cite to *Matrixx Initiatives, Inc. v. Siracusano*, where the U.S. Supreme Court found scienter after a drug manufacturer withheld reports that its top-selling cold medicine was linked to loss of smell.  563 U.S. 27, 49 (2011).  While the company in *Matrixx* learned negative information about one of its top selling drugs and sought to prevent disclosure, as discussed, the information redacted here was previously disclosed to the public.  (Am. Compl. ¶¶ 120–23.)  In other words, unlike the drug manufacturer in *Matrixx*, Kandi did not learn negative information about one of its products and seek to prevent disclosure to the public.  Accordingly, the redactions alone do not give rise to an inference of scienter.

## B.  Knowledge of Disclosure Requirements and History with Related Party Transactions

*Second*, Plaintiffs argue that Hu, Zhu, and Lim knew the requirements to disclose related party transactions because, as officers, they were tasked with ensuring Kandi's compliance with GAAP and financial reporting requirements.  (Pls.' Mem. at 16.)  Except, Defendants' mere "awareness of disclosure obligations does not show scienter."  *China Mobile Games & Ent. Grp.*, 4-CV-4471 (KMW), 2016 WL 922711, at *8 (S.D.N.Y. March 7, 2016).  Plaintiffs must instead show that Defendants "knew or were reckless in not knowing about the alleged related-party transactions."  *Id.*  Plaintiffs fail to do so here.  Contrary to their assertion, Plaintiffs effectively argue that Hu, Zhu, and Lim should have known to disclose the transactions at issue because of their prominent positions within the company.  (Pls.' Mem. at 16.)  It is well-established, however, that scienter cannot be shown by attributing facts to someone by virtue of their position within a company.  *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 366 (S.D.N.Y.

2015) (collecting cases and finding lack of scienter because plaintiffs must "do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions").

Indeed, Plaintiffs' own case citation is illustrative.  In *Zagami v. Nat. Health Trends Corp.*, the Northern District of Texas found it was "implausible to suppose that [individual defendants] did not know" certain transactions were with related parties, "given their high positions within the company and their compliance with [related party regulations] on other occasions."  540 F. Supp. 2d 705, 713 (N.D. Tex. 2008).  In other words, the individual defendants' positions, by themselves, failed to establish scienter.  *See id.*  The *Zagami* court only found scienter after critically relying on the individual defendants' compliance in reporting similar transactions on other occasions.  *Id.*  Meanwhile, Plaintiffs here argue the opposite.  That is, they claim that Defendants' historical *non-compliance* in reporting related parties is evidence they withheld the disclosures here.  (Pls.' Mem. at 17) ("Further, Defendants have a history of engaging in related party transactions and failing to disclose them.").  Even if *Zagami* supported Plaintiffs' argument, which it does not, the sole instance of non-compliance cited to by Plaintiffs was not attributed to the Individual Defendants.  Instead, as Plaintiffs concede, Defendants' auditor was censured rather than Kandi itself.  (Pls.' Mem. at 18) (alleging that Hu's prior failure to disclose related parties "result[ed] in severe consequences for the Company's auditor").  Accordingly, Plaintiffs fail to plead scienter based on Defendants' history of non-disclosure and alleged knowledge of reporting requirements.

### C.  Hu's Specific Knowledge

*Third*, Plaintiffs argue that Hu had specific knowledge of the undisclosed related party transactions through his own, his son's, and Kandi's ownership stakes in the related parties.

(Pls.' Mem. at 18.)  For example, Kuke was a former Kandi subsidiary, owned by Hu and his son until 2008.  (Am. Compl. ¶ 69.)  In addition, Yiheng is a 30% owner of Chaoneng who worked at Kandi and held key positions at companies owned by Hu and Kandi through 2018.[5]  (*Id.* ¶ 163.)  Even assuming that Kuke and Chaoneng were related parties, Plaintiffs fail to cite any authority holding that an executive's minority ownership in the alleged related party *over ten years* before the Class Period is evidence of scienter.  Likewise, Plaintiffs never explain how Hu should have known to disclose related party transactions because he once worked with an individual who happens to have a minority ownership in one of the alleged related parties.  And Plaintiffs cannot possibly expect the Court to impute knowledge to him through Hu's son.  As such, Plaintiffs have failed to plead that Hu had specific knowledge of the requirement to disclose the alleged related party transactions.

### D.  Failure to Disclose Known Negative Material Information

*Fourth*, Plaintiffs argue that Defendants' failure to disclose "known, negative material information concerning receivables" raises a strong inference of scienter.  (Pls.' Mem. at 19.)  This argument is wholly circular because it presupposes that Defendants had material information to disclose.  (Defs.' Reply Mem. at 7.)  Plaintiffs have failed to plead facts suggesting that Defendants knew there was a GAAP violation, let alone that Defendants deliberately withheld the disclosures.  *See ECA, Local*, 553 F.3d at 202 (no scienter where "Plaintiffs fail to allege sufficient facts to support an inference that [defendant] knew that the failure to report Mahonia as a related party was inaccurate").[6]

---

[5] Plaintiffs fail to explain how Hu had specific knowledge that Massimo or Jass Motorsports were related parties.

[6] Plaintiffs' lone case cite on this point is inapposite.  In *In re Complete Mgmt. Inc. Sec. Litig.*, the Southern District of New York found scienter where "the complaint establishes a strong inference that defendants were aware of the allegedly illicit practices" at the company's largest client, but the company "nonetheless concealed them in various reports and public statements."  153 F. Supp. 2d 314, 325–26 (S.D.N.Y. 2001).  As discussed, Plaintiffs have failed

17

### E.  Size and Importance of the Related Party Transactions

*Fifth*, Plaintiffs argue that the size and importance of the related party transactions further support the inference that Defendants were aware of their materiality and nature.  (Pls.' Mem. at 20.)  Not so.  Even assuming the undisclosed transactions here were large and important, "it is well established that the size of the fraud alone does not create an inference of scienter."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596 (S.D.N.Y. 2011) (quoting *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009)).  This is because "absent facts indicating that defendants knew of the falsity of their statements," even allegations of large misstatements do "not support the required strong inference of misbehavior."  *Id.* at 596–97 ("[T]he complaint in this case does not indicate that defendants had knowledge of their statements' falsity at the time those statements were made. Accordingly, that defendants wrote down seventy-two percent of their net income does not support the required strong inference of scienter."); *see also Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010) ("[T]he Complaint is bereft of factual allegations from which a reader could infer Defendants intentionally or recklessly failed to take write-downs on U.S. mortgage-backed securities. Because the size of an alleged fraud alone does not create an inference of scienter, Plaintiff's repeated allegation concerning the magnitude of the write-downs [here $2.5 billion] is insufficient to plead scienter.") (internal quotation marks omitted).

In addition, Plaintiffs argue that Defendants possessed scienter under the "core operations doctrine," (Pls.' Mem. at 20), which provides that "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business,

---

to plead that Defendants were aware of any requirement to disclose the related party transactions, let alone that they deliberately concealed them.

such as events affecting a significant source of revenue." *In Re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at \*3 n.4 (2d Cir. Oct. 25, 2022) (internal quotation marks omitted). The Second Circuit has "not clearly affirmed the validity of this doctrine following the passage of the PSLRA." *Id.* Nonetheless, to the extent the doctrine still applies in this Circuit, courts have found "it is not independently sufficient to raise a strong inference of scienter." *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 CIV. 1691 (RJS), 2018 WL 1725553, at \*15 (S.D.N.Y. Mar. 30, 2018) (internal quotation marks omitted). Because it remains unclear whether the core operations doctrine still applies—and because Plaintiffs have failed to plead independent facts supporting a strong inference of scienter—the Court declines to consider the doctrine here.[7] Thus, the size and importance of the transactions here do not provide an inference of scienter.

## F. Simplicity of the Alleged Violations

*Sixth*, Plaintiffs argue that the simplicity of the alleged violations establish scienter. (Pls.' Mem. at 21.) The Court disagrees. As a threshold matter, even assuming there was a technical violation, a GAAP violation alone is insufficient to establish scienter. *ECA, Local*, 553 F.3d at 200 (observing that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . . Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient"). In any event, the Court rejects Plaintiffs' generous proposition that deciding whether to disclose material related party transactions "involve simple accounting rules." (Pls.' Mem. at 21.) As numerous

---

[7] In a separate decision involving Kandi, Judge Schofield appeared skeptical of the same defendants' invocation of the core operations doctrine. *Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20 CIV. 8082 (LGS), 2021 WL 4952260, at \*4 (S.D.N.Y. Oct. 25, 2021) ("[A]lthough Hu, Wang and Mei presumably knew the identity of Kandi's counterparties in significant transactions, they would not necessarily have known (as part of core operations of the business) the test for what constitutes a related party under the applicable accounting rules or what disclosure is required.").

commentators have observed, related party determinations are notoriously difficult.  *See* American Institute of Certified Public Accountants, *Accounting and Auditing for Related Parties and Related Party Transactions*, 2010 Annual AAJ-PAPERS 26 ("One of the more important and yet more difficult aspects of a financial statement audit is the identification of related parties and transactions with related parties."); Corp. Governance Guide, *PCAOB's Chief Auditor Outlines 2007 Priorities*, Vol. 446, 2006 WL 8519424 (observing "that related parties have proven difficult for auditors because they are sometimes difficult to identify").

Indeed, the Amended Complaint illustrates just how difficult related party determinations can be.  Plaintiffs portray a complex web of allegedly interrelated individuals and companies—based on past and present affiliations—all which Plaintiffs allege give rise to a GAAP violation.  Many of the connections that Plaintiffs allege appear attenuated, several degrees removed and based on minority ownership interests.  As such, even assuming there was a technical GAAP violation, it can hardly be said that proper accounting for the transactions is "simple."

Throughout their briefing, Plaintiffs cite cases finding scienter based on far more obvious related party issues, typically involving direct ties or ownership by the defendants in the related parties.  *See Turner Ins. Agency, Inc. v. Farmland Partners, Inc.*, No. 18-cv-02104-DME-NYW, 2019 WL 2521834, *2, 6 (D. Colo. June 18, 2019) (finding scienter where defendant failed to disclose as related party transactions loans to defendant's manager and consultant); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 402 (S.D.N.Y. 2013) (wife of defendant's 34% shareholder formed separate company at defendant's behest to act as middle person in transaction where wife received compensation); *Henning v. Orient Paper, Inc.*, No. CV 10-cv-5887 (VBF) (AJWX), 2011 WL 2909322, at *6 (C.D. Cal. July 20, 2011) (finding scienter based on "obvious material omissions" regarding transactions with a company in which the individual

defendant had a 70% ownership interest); *see also Zagami*, 540 F. Supp. 2d at 713 (finding

scienter where defendants received millions of dollars in commission and company loaned

money to an entity controlled by the parents of an individual defendant).  The facts from these

cases bear no resemblance to the facts alleged here.[8]  Accordingly, the "simplicity" of any

alleged violations here does not support the finding of scienter, and Plaintiffs have failed to plead

scienter by recklessness.[9]  Plaintiffs' § 10(b) claim fails for lack of scienter.[10]

### III.    Exchange Act Section 20(a)

Because Plaintiffs fail to plead scienter, any claim under § 20 of the Exchange Act must

also be dismissed.  *See In re Sanofi Sec. Litig.*, 87 F. Supp 3d 510, 527 (S.D.N.Y. 2015) ("If

plaintiffs have not adequately alleged a primary violation, i.e., a viable claim under another

provision of the Securities Act or Exchange Act, then the § 20(a) claims must be dismissed.").

---

[8] Plaintiffs' remaining case citations are inapposite.  Two cases cited by Plaintiffs—both outside this circuit—involved restatements by the companies.  *See In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 WL 3154863, at *1 (D. Ariz. Aug. 9, 2010) (revelation of GAAP violation required company to issue restatement); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 652 (E.D. Va. 2000) ("That these violations occurred consistently over the entire Class Period, *resulted in such a large restatement*, and involved the violation of relatively straightforward accounting principles is probative of scienter.") (internal citation omitted) (emphasis added).  By contrast, Plaintiffs never allege that Kandi issued restatements conceding that it misreported related party transactions, even after publication of the Hindenburg Report.  In fact, Plaintiffs acknowledge that Kandi expressly denied the allegations contained in the report.  (Am. Compl. ¶ 152.)  And the remaining case cited by Plaintiffs involved "a pattern of knowingly misleading practices that overwhelmingly overstated revenues," which is inapposite in assessing related party determinations.  *S.E.C. v. DCI Telecommunications, Inc.*, 122 F. Supp. 2d 495, 500 (S.D.N.Y. 2000).

[9] Plaintiffs also claim that the alleged related parties shared the same or related phone numbers, addresses, or trademarks with Kandi.  (Am. Compl. ¶¶ 59, 60, 62, 66, 82, 87.)  Standing alone, these allegations fail to raise an inference of scienter because Plaintiffs nowhere connect the allegations with a specific intent to defraud.  *See Tellabs*, 551 U.S. at 308 ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud.") (internal quotation marks omitted).

[10] Having found that Plaintiffs failed to plead scienter, the Court does not reach the remaining 10(b) elements.  *See Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 778 (S.D.N.Y. 2021) ("If Defendants have failed to plead scienter, the Court need not proceed further.").

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint for failure to state a claim is GRANTED.  Plaintiffs' Amended Complaint is dismissed in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
March 29, 2024

/s/ LDH
LASHANN DEARCY HALL
United States District Judge